[Civ. No. 38996. Second Dist., Div. Three. Apr. 25, 1972.]

ELIZABETH ROBIN ATWOOD, Plaintiff and Respondent, v.
LOUIS VILLA, Defendant and Appellant.

**COUNSEL**

Patterson, Ritner & Lockwood and John A. Patterson for Defendant and Appellant.

Davis, Voorhies & Thompson and James H. Davis for Plaintiff and Respondent.

## OPINION

**ALLPORT, J.**—On June 13, 1968, a collision occurred between automobiles being operated by plaintiff and defendant at the intersection of Stocker and Dorothy Streets in the city of Glendale. Stocker runs east and west and Dorothy north and south. Plaintiff was traveling west and defendant east on Stocker. Defendant was in the process of making a left turn to go north on Dorothy when the collision took place. Stocker is 40 feet wide and, being in a residential area, the prima facie speed limit was 25 miles per hour. As a result of this accident a complaint was filed seeking general and special damages for personal and other consequential injuries. A first cause of action was based upon negligence and a second on the theory of recklessly, wilfully and intentionally operating the vehicle in violation of law, in a state of intoxication, in an attempt to escape arrest by the police and in utter, wanton and reckless disregard for the life and safety of plaintiff. Defendant's answer denied negligence and damage and alleged contributory negligence and assumption of risk as affirmative defenses. The following issues were submitted to the jury: (1) negligence; (2) proximate cause; (3) nature and extent of injuries and damage; (4) wilful or wanton misconduct, and (5) contributory negligence. At plaintiff's request the jury was instructed that: "Contributory negligence of a plaintiff is not a bar to his recovery for an injury caused by the wilful or wanton misconduct of a defendant.

"Wilful or wanton misconduct is intentional wrongful conduct, done either with knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results." (BAJI No. 3.52.)

The jury returned a verdict for plaintiff and judgment was entered in her favor for $30,000. Defendant's motion for a new trial was denied upon condition that plaintiff file a written consent to a reduction of the verdict to $21,000, or if not the motion be granted on the issue of damages alone. Such written consent was filed. Defendant appeals from the judgment and "the order granting, Elizabeth Robin Atwood, plaintiff, a limited new trial on the issue of damages. . . ." The appeal lies. (Code Civ. Proc., § 904.1, subds. (a), (d).)

It is contended on appeal, among other things, that the giving of the instruction on wilful or wanton misconduct, quoted above, was error. We agree with this contention. It is true, as argued by plaintiff, that a party is entitled to have the case submitted to the jury upon his theory of the case. However, such is true only when there exists substantial admissible evidentiary support therefor. (See *Cummings* v. *County*

*of Los Angeles,* 56 Cal.2d 258, 268 [14 Cal.Rptr. 668, 363 P.2d 900].)
 We have not been referred to, nor has independent examination of the record revealed, any legally admissible evidence supportive of the proposition that defendant was guilty of wilful or wanton misconduct such as to justify or require the giving of this instruction. The witness Tammy Macklin did not see the accident. She described defendant's operation of his vehicle prior to the collision as follows: "Q. Miss Macklin, when Mr. Villa was traveling westbound on Stocker after the police officer turned right and went, I guess, eastbound, did Mr. Villa make a boulevard stop at the stop sign? A. Yes, he did. Q. How would you describe the way he started out? Did he spin rubber? A. No, he started out slow. Q. Did you watch him as he proceeded westbound between Pacific and Dorothy? A. As far as we could see, yes. Q. As far as you were—strike that. How far were you able to see him? A. Just after he got past Pacific a little ways. Q. Well, that little ways that he just traveled, would you describe that as half a block or what? A. Yes, I guess so. Q. Now, in that half a block that you were able to watch him, did he do anything in the operation of his car other than drive normally? A. No. Q. He didn't, like, speed up or anything that you saw, did he? A. No, he didn't speed up."

We have examined the testimony of defendant and find that at most such can be said to support a finding of negligence based upon conduct in violation of Vehicle Code section 21801, subdivision (a).[1] He testified to no facts which can be said to establish wilful or wanton misconduct on his part. The same can be said of plaintiff's testimony. With respect to the happening of the accident she testified as follows: "Q. And as you came up to the corner did something unusual happen, Miss Atwood? A. Well, yes. Just about a few feet away from the corner I had seen a car coming toward me, opposite direction, and all of a sudden the car started to make a left turn without any signal. Q. And what did you do? A. I applied my brakes. Q. And was there a collision, Miss Atwood? A. Yes, there was."

"Q. You were proceeding westbound on Stocker approaching Dorothy when you observed Mr. Villa's car; is that correct? A. Yes. Q. Where was his car when you first observed it? A. The first time I saw his car was, I would say he was halfway across the intersection, if not almost completely

---

[1]Vehicle Code section 21801, subdivision (a) reads: "The driver of a vehicle intending to turn to the left at an intersection or into public or private property, or an alley, shall yield the right-of-way to all vehicles which have approached or are approaching from the opposite direction and which are so close as to constitute a hazard at any time during the turning movement and shall continue to yield the right-of-way to such approaching vehicles until such time as the left turn can be made with reasonable safety."

across the intersection of Pacific and Stocker. Q. Where was your car at that time? A. I am not sure at all how far east of Dorothy I was at that time. I don't know. I couldn't even guess. Q. Well— A. It was a clear day and terrific visibility, just a car coming in the other direction toward me. Q. Was there anything unusual about Mr. Villa's car that called your attention to it? A. Not until it was in front of my car. Q. So you didn't particularly pay much attention to Mr. Villa as he drove between Pacific and Dorothy until he started his left turn; is that correct? A. I saw him all this time. I mean, I saw him coming, his car coming toward me the same as you notice any other car coming toward you. Q. But as you saw it coming toward you, there was nothing that led you to believe there was going to be an accident between his car and your car, was there? A. No, there was certainly nothing that indicated he was going to turn left. Q. He was, as far as you could tell, driving his car as you would expect a person to drive their car, eastbound on Stocker between Pacific and Dorothy? A. Precisely, just driving straight down the street."

"Q. Now, the next thing is, as I understand it, you said that Mr. Villa was looking in his rear view mirror? A. Well, his head was tilted up toward the mirror (witness indicating), I mean, I couldn't see his eyeballs but I could see the direction that his face was. Q. And this was before he started his turn; is that correct? A. No, it was while he was into the turn. He was starting to make the turn. That is why I tried to stop. Q. And you were able to observe where he was looking as he was approaching you before he started to turn; is that correct? A. No. I was able to see where his face was when he was into his turn as he was starting into his turn, not before, but as he was starting into his turn. Q. About how fast was he traveling then? A. I don't know. Q. About how far away was your car from his car when you observed him starting into his turn? A. I don't know."

James A. Clarey, a police officer of the City of Glendale, was an eyewitness to the collision and the events leading up thereto. He testified that: "Q. Then what did you do, Officer? A. I made a U-turn in the police unit and as the white Chevrolet started across the intersection— Q. And you proceeded after him, did you? A. Yes, I did. Q. Now, Officer, you were present and behind him at the time the accident occurred; is that correct? A. Yes, sir, I was. Q. Approximately how far behind him were you at the time the accident happened? A. Seventy-five to eighty feet, I believe."

"Q. All right. And at that time the car was at a boulevard stop? A. It was approaching a boulevard stop. Q. Did he make the stop? A. Yes, he did. Q. And was there anything that would prevent him from seeing

your car as he approached that boulevard stop? A. No. Q. What kind of boulevard stop did he make? A. The proper boulevard stop. Q. All right. Then did you continue to watch him as best you could and make a U-turn? A. Yes, I did. Q. All right. And how far did you proceed westbound before you made the U-turn? A. There is a gas station on the corner. I believe I went into the first driveway west of the intersection. Q. And so you made your U-turn a few seconds after the girls pointed out Mr. Villa's car? A. Yes, I did. Q. And then you were able to watch Mr. Villa as he drove eastbound on Stocker then, were you not? A. Yes, I was. Q. Now, did Mr. Villa do anything as he drove eastbound on Stocker between Pacific and Dorothy that would lead you, a trained police officer, to feel that he was trying to flee from you? A. No, he did not. Q. About what was the highest rate of speed that his car attained in your opinion between Pacific and Dorothy? A. Approximately 25 miles per hour. Q. Incidentally, Officer, this is a residential area? A. Yes, it is. Q. What is the speed limit in a residential area? A. Twenty-five."

"Q. Now, Officer, did Mr. Villa change his speed as he approached Dorothy? A. Yes, he did. Q. And did he change his speed before he made his left turn? A. Yes, he did. Q. About how slow do you feel he slowed his car before he started his left turn? A. Probably two to three miles per hour. Q. And at this time you don't recall whether or not you saw any signal; is that correct? A. That's correct. . . . Q. Now, Officer, your police report statement said, 'I was eastbound on Stocker dash I started to turn left onto Dorothy period. I didn't see the other car and I hit her, period unquote.' Now, Mr. Villa said more than that there at the scene, didn't he? A. Not to my recollection. Q. Didn't he say more than three sentences? A. Well, if he had said more I would have put more down."

"Q. Now Officer, there was one reference also to your seeing him start his turn. Actually, these figures that have been put up here, five foot west of west Dorothy, that means five feet west of the west curb of Dorothy; doesn't it? A. Yes. Q. If we take the west curb of Dorothy and extend it down here, the point of impact happened west of that? A. It would be five feet west of that point, yes. Q. All right, sir. And as a matter of fact, when he started that turn about 50 percent of his car was over the center of the street, wasn't it, Officer? I think that is the reference in the deposition, if I can find it. (Reading at Page)—Actually, his car was about straddling the line about the time of this impact, wasn't it? A. Correct. Q. All right. So what he had done is, he had commenced his turn, the impact took place five feet west of the west curb line and 15 feet south of north Stocker, that is, south of the north curb of Stocker, correct? A. Correct. Q. So that with a 40-foot wide street he is already over the

center line, isn't he, Officer? A. Yes. Q. So he had commenced his turn before he got to the corner by your own figures, hadn't he, Officer? A. Yes, he had. Q. Now Officer, there was another reference to your feeling about whether or not the two cars would come together in the course of this turn. I take it since you were so close behind him you would hope they wouldn't in terms of— A. As he slowed to start his turn, it appeared in my opinion that he might have had time or he had time to make the turn."

A consideration of the above testimony and the entire record fails to disclose any support for the claim that defendant was guilty of wilful or wanton misconduct. There is no evidence justifying an inference that he was driving at an excessive speed, was under the influence of liquor or drugs, was attempting to escape from arrest or that his vehicle was erratically operated in a wanton, reckless, and utter disregard for the life and safety of plaintiff. We conclude that the issue of wilful and wanton misconduct presented in the second cause of action was not supported by any admissible evidence and are therefore compelled to the conclusion that it was error for the trial court to submit that issue to the jury. (*Miller v. Western Pac. R. R. Co.*, 207 Cal.App.2d 581, 590 [24 Cal.Rptr. 785].)

Our conclusion in this respect is not necessarily determinative of the matter. We are aware that by constitutional mandate no judgment entered on the jury's verdict shall be set aside on the ground of misdirection of the jury unless, after an examination of the entire cause, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) Ordinarily it would appear that, in a so-called left turn automobile accident case where the allegations of negligence, contributory negligence and proximate cause find support in the record and the jury was properly instructed on the issues, the giving of an additional instruction on wilful or wanton misconduct might not be deemed to have resulted in a miscarriage of justice. However, we are not presented with the ordinary situation in the case at bench. In the first place we note that the testimony of Officer Clarey and that of defendant's expert witness Thomas Ward was sufficient to support an inference that plaintiff herself was negligent in approaching the intersection at a speed in excess of that allowable in a residential district. Whether or not she was in fact negligent and whether or not that negligence, if found by the jury to exist, was a proximate cause of her injury and damage were questions to be determined by the jury under proper instructions. The instruction on wilful or wanton misconduct, which we have determined to have been erroneously given, stated in part that contributory negligence was not a defense to recovery for an injury caused thereby. The giving of the instruction, in the absence of evidentiary support therefor, was prejudicial in

that it operated to remove from consideration the defense of contributory negligence.

The record discloses an additional reason involving the allegation of wilful or wanton misconduct for reversal of this judgment. It is the function of court and counsel, as officers of the court, to see that the parties receive a fair and impartial trial. We believe that the erroneous admission of evidence concerning allegations of defendant's participation in a course of criminal conduct very shortly before the happening of the accident and capitalization thereon by plaintiff's counsel during argument was instrumental in depriving this defendant of his rights in this respect. At the outset of the trial, and prior to jury selection, defense counsel endeavored, by way of motion for a protective order, to exclude from the jury's consideration anticipated testimony to the effect that shortly prior to the accident, both in time and distance, defendant had deliberately indecently exposed himself in the immediate presence of the witness Macklin and one of her friends, both 17-year-old females. The motion was denied upon the ground urged by plaintiff's counsel that "the fleeing from the police and the state of mind at that time were all pertinent to the issue of reckless and wanton misconduct and are highly pertinent why and how this accident happened. . . ." In ruling, the court after endeavoring to effect a settlement of the case and in answering defense counsel's argument, commented on several occasions as follows: "THE COURT: You told them even how the Judge is being stubborn about, not stubborn, but disagreeing with you on your theory as far as the testimony by the two girls was concerned? MR. PATTERSON [Defense counsel]: I told him, yes, your Honor. They also felt that it would be prejudicial and at the same time they don't feel that, you know, they should pay money. I mean, I don't believe that we are being sued because of the fact that he committed an indecent exposure. THE COURT: This is true. But sometimes you are faced with a group of unsavory facts that you just can't avoid, because we don't know exactly what influence that had on that fellow's mind when he was driving that car down the street, how it might have affected his judgment. We don't know how far he went as far as this exposure is concerned. MR. PATTERSON: Well, your Honor— THE COURT: He didn't hardly have time to really, apparently, I don't know how long he was there, but apparently he wasn't there a long time exposing himself to these girls. They get some sort of a sexual satisfaction out of it. I don't know whether he had his satisfaction or not; nobody has indicated that. How long was he there? MR. DAVIS: He stopped first. THE COURT: Was it a half hour? MR. DAVIS: No, no, it was a matter of a few minutes. THE COURT: No one really knows exactly what effect that might have on his driving, and it is just an unsavory set of facts. MR. PATTERSON: Yes, sir, but I still don't see how any way

in the world it would constitute wilful and wanton misconduct. THE COURT: I am almost in accord with you on that, despite the fact that the plaintiff says that he is entitled to have the jury instructed on all theories of his case. He has to have something in there that might indicate he has a reason for that theory, other than the man having little problems other than driving, but I haven't yet said that I would instruct them on wanton and wilful misconduct, but I have said that I plan on letting the jury know what went on. MR. PATTERSON: Well, could we let the jury know what went on? In other words, your Honor, it is not coming in because of wilful and wanton misconduct. I can't see any reason why in the world it would ever be allowed in. THE COURT: It shows how well he is driving. You said he was going three miles an hour before he made his left turn? MR. PATTERSON: The police officer testified to that. THE COURT: He has made a boulevard stop. Well, it might appear that it wasn't affecting him at all, but now the plaintiff feels that he was practically blind and maybe this is the thing that he saw, this group of girls over there he saw made him blind. Now maybe I am wrong. MR. PATTERSON: All I can say, your Honor, what would be wrong with stipulating to the fact that he had committed a misdemeanor and that the police officer was following him with the intention of stopping him and questioning him about that? Then aren't we bringing out the fact that he still has a guilt conscience in looking at the police officer in the rear view mirror? I feel the only reason that they want to bring out the fact that he was exposing himself to these young girls is to inflame the jury, and I feel that it would be very prejudicial. THE COURT: I know that is what you feel, and apparently he feels that if that is kept out that is going to definitely hinder him in showing what this man's state of mind was as he was driving, and I just say it is just an unsavory set of facts. MR. PATTERSON: But the unsavory set of facts, sir, what is the— THE COURT: Just born with it or stuck with it. MR. PATTERSON: Well, what is the relevancy of what type of misdemeanor he was committing? In other words, the fact— THE COURT: The relevancy is that just the way you are talking about it right now. It indicates that it would have some effect, might have some effect on him as well as on the jury, but we can't keep everything out just because it might inflame the jury. They will have to be instructed somehow or other to forget about it and we are not trying this man for his character and whatnot, but we are trying him for his driving ability, and I agree with you, it's kind of a weak instruction at times. MR. PATTERSON: Like I say, I have made my motion. THE COURT: You have made your remarks on the record and I plan on allowing the girls to testify and just testify as to the events, and whether or not we are going to allow the wanton and wilful misconduct instruction go in, it is going to be decided at a later time."

Following denial of the motion counsel interrogated the jury at length on this subject. Thereafter in an opening statement before the jury plaintiff's counsel described defendant's act of indecent exposure. Tammy Macklin was permitted to testify on direct examination by plaintiff's counsel regarding defendant's actions. Finally, in commencing his final argument this attorney said: "Your Honor, Mr. Patterson, Ladies and Gentlemen of the jury: This is my opportunity now to argue the case and this is my chance to relate what occurred here by way of evidence to the rules of law. We have had a better opportunity to talk to the witnesses. We have had a better opportunity to discuss and look at the law, and so before you decide this case we find it helpful if you put the two together as it relates to the issues that are pertinent to this kind of case. That is how a lawyer is supposed to approach the case.

"To me, this is a very difficult case to approach dispassionately for two reasons. First, it is difficult for me to approach it dispassionately because you have now met Robin Atwood and know her, I mean, not so well, perhaps, as I do, but you know her and you know that she is honest and you know that she is lovely and you know that she has been hurt, and for that reason it is difficult for me to approach this case as dispassionately as I should.

"The second reason this case is difficult for me to approach dispassionately is that I have a daughter who is not yet a teenager, only one child, and to have the kind of things that everything clearly goes on here as close to a high school as they have is profoundly disturbing to me.

"MR. PATTERSON: Excuse me, your Honor, I am sorry. I am not sure, are we arguing about the auto accident or are we arguing about the criminal aspect of the case, or what are we arguing about? THE COURT: We are going to try to restrict the argument to the automobile accident and you will, to the best of your ability. You may proceed."

In reply defense counsel argued: "Now, one thing Mr. Davis told you when he started, he said that this case has been distasteful to him and he said, he started to tell you again about the school and about his daughter. Now, I happen to have three teenage daughters and I have two boys and they all go to school, and I quite frankly defy Mr. Davis to explain why his continual reference to the fact that this was near a school has anything whatsoever to do as far as Mr. Villa is concerned.

"In my opinion, obviously the only reason he brings up something like that is to inflame your passions against Mr. Villa, and quite frankly I think that was unfair.

"Now, you all told me that you would put out of your mind any feeling you had as to whether or not Mr. Villa did or did not do something improper prior to this accident. Whether he has been a good man the rest of his life has nothing to do with what happened that day, and as far as that goes, he is not on trial here, and if there was any evidence that was pertinent it would have been brought out, I am sure, by Mr. Davis on that point.

"Now, the thing I am trying to say is that I don't think that that evidence should have ever been introduced into this case because basically we are here because of a traffic accident."

In closing plaintiff's counsel replied: "Then you get into the question of willful misconduct, and how did Mr. Patterson put it? He said, why, it is absolutely irrelevant, absolutely irrelevant, the whole course of conduct of Mr. Villa. Now, do you think the state of mind of a man driving down the street who is being chased by the police is irrelevant to an accident? Irrelevant? Irrelevant? Irrelevant? It is the most pertinent explanation for why this accident occurred.

"Here is a man who has just gone by two young girls, who has circled the block several times. I think he actually made a U-turn, and I think that is what the evidence is. Here is a man in an unusual emotional frame of mind. Here is a man who is concerned about being picked up by the police. Here is a man who, at the corner, must have seen the girls point him out as the man who was just around there in front of them, and here is a man who says he is on his way to the market to get some corn. Now, where was the market? The market is down here. The market is east. Yet he turned north. Do you think after, as he put it, he circled the block thinking about corn that long he at least figured out which direction the market was, wouldn't you? Is it irrelevant, his state of mind? If you accept that, if you accept that it is irrelevant, then I am amazed at the credulity of the people in our community. To me it is the most pertinent explanation for why this accident happened.

"He was driving along the road. He was looking in his rear view mirror at the police. He had wandered over the center line and he was hoping he could get out of the way and get away from those police without being picked up and without being questioned about just what he had done.

"Now, may I borrow that dictionary for a minute? If we are going to read from dictionaries let's read from it. I don't think it is the law and I don't think it is proper law, but let's read from it."

"THE COURT: This is still only argument."

"MR. DAVIS: I hope I have made it clear what I am saying. He's got to prove it. We will go back to this point here, just to sum it up for just a moment, what the proximate cause was. He hasn't done that. But I have said assuming for purposes of argument that he had proved it, then we go to the next question of willful misconduct, and the rule is that a person who is guilty of recklessness cannot rely on the defense of contributory negligence."

We are satisfied that to permit an opening statement, evidence, and argument pertaining to the allegation of indecent exposure was prejudicial error on the state of the record before us. Evidence Code section 350 provides that "No evidence is admissible except relevant evidence." Section 352 provides that "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, . . ." In the instant case all evidence dealing with the manner in which defendant operated his vehicle as he approached the scene of the accident was relevant on the issues of his negligence or his wilful or wanton misconduct. His state of mind was only of importance in explaining the reason for his manner of driving and under the facts presented was completely irrelevant. Defendant did nothing as he drove eastbound on Stocker between Pacific and Dorothy to indicate to Officer Clarey that he was trying to flee. The officer never turned on his red light or siren, honked his horn or otherwise indicated that defendant should stop. There was no evidence to justify inquiry into defendant's state of mind on the subject in question. His state of mind, under the circumstances, was irrelevant. On the other hand, the testimony of indecent exposure was certainly susceptible of creating a danger of undue prejudice against defendant. We feel that it was an abuse of discretion to allow this testimony and that the exploitation thereof by plaintiff's counsel in argument may well have resulted in a miscarriage of justice. The case should have been submitted to the jury on the issues of negligence, proximate cause, contributory negligence and damages. The bare allegation of wilful and wanton misconduct in the complaint, unsupported by evidence, did not raise any issue justifying or compelling the admission of the evidence of indecent exposure or its exploitation before the jury. Sans the erroneous instruction and the evidence of indecent exposure the proper issues would have been presented to the jury for decision unhampered by any consideration of irrelevant inflammatory

matters with the result that the constitutional and statutory safeguards to a fair trial would have been preserved.

The judgment is reversed.

Cobey, Acting P. J., and Schweitzer, J., concurred.

A petition for a rehearing was denied May 16, 1972, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied June 22, 1972. Peters, J., was of the opinion that the petition should be granted.