[Crim. No. 13535. First Dist., Div. One. Dec. 9, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND VARGAS, Defendant and Appellant.

## Counsel

Sheldon Portman, Public Defender, and Frank D. Berry, Jr., Deputy Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Charles R. B. Kirk and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SIMS, J.**—Defendant has appealed from a judgment of conviction sentencing him to state prison for furnishing a restricted dangerous drug in violation of former section 11912 (now § 11379) of the Health and Safety Code.[1] The defendant, who absented himself from his trial on July 15, 1971, was not sentenced until after he was apprehended and taken into custody in February 1974, some 31 months later. He now

[1]Defendant was originally charged with furnishing a restricted dangerous drug, amphetamine, to a 13-year-old minor in violation of former section 11913 (now § 11380) of the Health and Safety Code. A jury found him guilty of that offense, which provides for a sentence of a period of 10 years to life, and prohibits release on parole until not less than 5 years have been served. On defendant's motion for a new trial he asserted, among other contentions, that the trial court erred by omitting to instruct on the lesser offense proscribed by former section 11912, and that the omission was prejudicial because the prosecution failed to allege or to offer any evidence that the defendant was 21 years of age or over as required by section 11913, as it read on April 5, 1971, when the offense was committed. (Stats. 1970, ch. 1098, § 17, pp. 1955-1956; and see *People* v. *Montalvo* (1971) 4 Cal.3d 328, 332-336 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518].) The conviction was accordingly reduced.

contends that his conviction must be reversed (1) because the trial court erred in proceeding with the trial in his absence; (2) because he was denied the effective assistance of counsel who, he alleges, violated the privileged confidential relationship with defendant by revelations to the court in connection with the court's determination to proceed, and who failed to interpose proper objections to incompetent, irrelevant and prejudicial evidence offered by the prosecution; and (3) because the court erred in giving instructions on flight and with respect to the quantity of a restricted drug that was usable. He further asserts that the trial court abused its discretion in failing to grant him probation, and that the provisions of section 11912 (now § 11379) which require imprisonment for a period of not less than three years before the defendant is eligible for parole are unconstitutional.

On review no merit is found in defendant's attack on his conviction. We do conclude that, as applied to the facts in this case, the provisions of the Health and Safety Code which fix a 36-month requirement of imprisonment before eligibility for parole are unconstitutional insofar as they exceed the 20 months required under the provisions of section 3049 of the Penal Code.

At about 3 p.m. on Monday, April 5, 1971, the first day of her Easter vacation, Leigh Daly, a 13-year-old eighth grade junior high school student, was walking from a radio station in Santa Clara County to her grandmother's home. While taking a shortcut through a vacant lot she stopped to light a cigarette. Because of the wind she stepped behind a tree, but was still unsuccessful in lighting the cigarette and ran out of matches. She noticed a man watching her from a white car. As she started to walk away he approached her and asked her if she needed a light. Miss Daly lit her cigarette from a burning one he handed her. As she returned his cigarette, he pressed some folded tissue paper into her hand, and said, "Here baby, drop some whites." She tried to hand them back, saying she didn't need them, and he offered her a ride to wherever she was going. She refused, thanked him for the light, and walked away. Glancing at what was pressed in her hand, she saw yellow tissue but didn't see what was inside. She saw the man getting back into the car.

Miss Daly took down the license number of the car, UYJ 932. It was a Riviera. She remembered the man wore a T-shirt, jeans, boots, and appeared to be of Spanish descent. He had a mole on his left cheek.

After the incident, Miss Daly went to her grandmother's house, which was four blocks away. She told her grandmother what had happened and asked her to call the police because she thought the tissue paper might contain drugs. She opened the paper and found that it contained three double scored pills. The police were called.

Investigating police officers traced the license number of the suspect's car and arrested him as he was leaving work after midnight. At the trial Miss Daly and the investigating officer identified a photograph of the defendant as the man involved. Analysis by a criminologist showed that the pills contained amphetamine. Other evidence is referred to below where pertinent.

I

Defendant's trial commenced on July 14, 1971, and he was present throughout the proceeding on that day. After the completion of the selection of a jury the court ordered the case continued to 9:30 a.m. the following day for the commencement of the presentation of evidence. On the following morning the defendant was not present in the courtroom, and at 9:55 the court consulted with the attorneys, secured certain admissions from defendant's counsel, and over his objection ordered the case to proceed.[2]

---

[2]The proceedings are reported as follows: "THE COURT: Good morning, ladies and gentlemen. Will the attorneys approach the bench, please. (Whereupon, the following proceedings were had outside the hearing of the jury:) [Defendant's Attorney]: I just was talking to him a little while ago and he said he wanted to go to his car to get his sport coat. I went over and didn't see his car. I think he took off because he told me, he kept saying, 'She might not show up.' I said she probably will. He wanted to get his sport coat right after she walked in. THE COURT: Well, the Bailiff tells me he was here this morning. [Defendant's Attorney]: He was here this morning. I saw him. THE COURT: And he indicated to you that he might not be here? [Defendant's Attorney]: Well, he says the little girl might not show up. He kept telling me this. I said she probably will. Just as soon as she did show up and started to talk to [the deputy district attorney] he said, 'I want to get my sport coat,' and he took off. [Deputy District Attorney]: Perhaps we should do this: This is a serious offense. THE COURT: We are going to go ahead without him. [Defendant's Attorney]: Your Honor, can I plead him to a lesser? THE COURT: You can't plead him he is not here. [Deputy District Attorney]: He is not here. Do you want to recess for an hour, wait, or proceed? THE COURT: It appears he is voluntarily absent. He was due here at 9:30 and he was here at 9:30 and he has departed. So, Mr. Grube, I want you to issue a no bail warrant for the defendant and get it right out. THE CLERK: Okay. (Whereupon, the following proceedings were had in open court, in the presence and hearing of the jury:) THE COURT: Ladies and gentlemen, as you have noticed, the defendant is not here. He was here earlier this morning. It appears he has voluntarily left. Under the Constitution and the laws of the United States and the State of California, we are entitled to proceed in his absence since he is voluntarily absent, so we are going to proceed."

After the People rested their case defendant's counsel objected to being required to proceed in his client's absence. He reported to the court that he had been unable to contact his client, and requested a continuance of a week to find the defendant. Out of the presence of the jury the prosecuting witness' mother testified that she had seen the defendant at the preliminary hearing and that she saw a man she thought was the defendant running through the parking lot of the courthouse after 9 a.m., and before the court session was to begin. Defendant's attorney repeated under oath the substance of the statement he had given when the defendant's absence was first noted. The court denied the motion for a continuance and ordered that the case proceed. The defense rested without presenting any evidence, and the jury returned its verdict the same day.

On August 5, 1971, defendant was still at large. It was suggested that defendant was in Mexico. Sentencing was postponed until he could be apprehended. His bail was ordered forfeited January 25, 1972. Defendant was arrested on February 11, 1974, over two and one-half years after his trial. A few days later defendant's retained counsel withdrew from the case, and the public defender was appointed to represent him. Defendant told the probation officer that he fled on his counsel's advice, but when his former attorney stated to the contrary at a hearing on the matter, and reiterated his version of the preflight discussion with defendant,[3] the defendant did not challenge the attorney's statement. Subsequently the court denied defendant's motion for a new trial other than to reduce the offense. (See fn. 1 above.)

As pointed out by the defendant, the right of one charged with a crime to be present at his trial is established by constitutional provisions. (See

---

[3]The record reflects: "THE COURT: Did you tell him to leave? [Defendant's Attorney]: Of course not. The day before the trial, while we were waiting for court, he questioned me in regard to what would happen if he did leave. I told him he would be picked up on a bench warrant probably. And I was trying to attempt at this time to get him a plea bargain with the District Attorney's Office, who offered a sale instead of sale to a minor, which was a lesser, and he said he wanted to go all the way. And his position was that this girl was not going to testify against him. However, she did testify in Municipal Court, so on the second day of trial when she did come in and testify against him, then that is when he got all upset and he asked what his chances were and I said 'They are very bad at this time' and that is the way it was left. At that time I certainly didn't want him to leave the court and leave me without a client and try to explain his case to the jury without a client being present. I didn't have a chance in the world. And even with that, I had a couple of jurors later come and tell me that they would have liked to give him some benefit of the doubt except for the fact he did leave. And this was after deliberation. As I remember, if I recall right, they deliberated for about three or four hours."

U.S. Const., Amend. VI; *Illinois* v. *Allen* (1970) 397 U.S. 337, 338 [25 L.Ed.2d 353, 356, 90 S.Ct. 1057]; Cal. Const., art I, § 15 (cf. former § 13); Pen. Code, § 1043, subd. (a).)[4] It is also established that a waiver of a constitutional right will not be presumed or lightly inferred. (See *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]; *In re Tahl* (1969) 1 Cal.3d 122, 127 [81 Cal.Rptr. 577, 460 P.2d 449] [cert. den. (1970) 398 U.S. 911 (26 L.Ed.2d 72, 90 S.Ct. 1708)]; and Pen. Code, § 977.) Defendant recognizes that subdivision (b) of section 1043 of the Penal Code permits a trial in absentia in a noncapital case when "the defendant is voluntarily absent." The thrust of his argument is that the court acted precipitously and on insufficient evidence in determining, at the time defendant's absence was discovered and at the conclusion of the People's case, that the defendant's absence was voluntary. He asserts that the statements and testimony of defense counsel at the trial should have been disregarded because the attorney-client privilege was violated by the attorney, and, alternatively, if such statements and testimony are to be considered there was a constitutionally inadequate representation by counsel. (See part II below.) He insists that the court should have adjourned temporarily to allow counsel or law enforcement personnel to locate the defendant, or that it should have declared a mistrial to await the defendant's arrest and return.

While the question of the sufficiency of the showing on which the court acted to find that the defendant's absence was voluntary has a certain academic interest, it is obvious on the entire record that any error in the court's action on July 15, 1971, was not the cause of any prejudice to defendant, because the whole record reflects that any procrastination or delay in proceeding would have been unavailing, and that in fact the defendant's absence was not only voluntary but prolonged. To require a new trial under the circumstances of this case would put a premium on flight, and nullify the provisions of subdivision (b) of section 1043. In *People* v. *Connolly* (1973) 36 Cal.App.3d 379 [111 Cal.Rptr. 409], the court observed that the question of why is the defendant absent "can rarely be answered at the time the court must determine whether the trial should proceed. Consequently, in reviewing a challenge to the continuation of a trial pursuant to Penal Code section 1043, subdivision (b)(2), it

---

[4]So far as is pertinent in this case, section 1043 of the Penal Code provides as follows: "(a) Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial. [¶] (b) The absence of the defendant in a felony case after the trial has commenced in his presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: . . . (2) Any prosecution for an offense which is not punishable by death in which the defendant is voluntarily absent."

must be recognized that the court's initial determination is not conclusive in that, upon the subsequent appearance of the defendant, additional information may be presented which either affirms the initial decision of the court or demands that defendant be given a new trial. It is the totality of the record that must be reviewed in determining whether the absence was voluntary." (36 Cal.App.3d at p. 385. See also *People v. Malloy* (1974) 41 Cal.App.3d 944, 954 [116 Cal.Rptr. 592]; *Taylor v. United States* (1973) 414 U.S. 17, 20 [38 L.Ed.2d 174, 177-178, 94 S.Ct. 194]; and *Cureton v. United States* (D.C.Cir. 1968) 396 F.2d 671, 676 [130 App.D.C. 22, 21 A.L.R.Fed. 897].)

The fact that the defendant, who was on bail, had met all of his required court appearances, including the first day of trial at which the jury was selected, and had been present and left, not merely failed to appear, at the second day of trial permitted the court to conclude, both on July 15, 1971, and after defendant's apprehension, that the defendant's absence was voluntary. In *Taylor v. United States, supra,* the court observed, "It is wholly incredible to suggest that petitioner, who was at liberty on bail, had attended the opening session of his trial, and had a duty to be present at the trial, [citation], entertained any doubts about his right to be present at every stage of his trial. It seems equally incredible to us, as it did to the Court of Appeals, 'that a defendant who flees from a courtroom in the midst of a trial—where judge, jury, witnesses and lawyers are present and ready to continue—would not know that as a consequence the trial could continue in his absence.' 478 F.2d, at 691 [1973]." *(Taylor v. United States, supra,* 414 U.S. 17, 20 [38 L.Ed.2d 174, 178].) The Supreme Court also disapproved *United States v. McPherson* (D.C.Cir. 1969) 421 F.2d 1127 [137 App.D.C. 192], upon which defendant relies in this case, insofar as it indicated that the court was required to expressly warn a defendant, not only of his right to be present, but also that the trial would proceed in his absence. (414 U.S. at p. 19, fn. 3 [38 L.Ed.2d at p. 177], and accompanying text. Cf. 421 F.2d at p. 1130.)

The observation made by the prosecuting witness' mother indicated that the defendant was leaving in haste. Whatever may be said concerning the statements and testimony of defendant's counsel on July 15, 1971 (see part II below), his testimony was properly considered in the 1974 hearing. Defendant had accused his attorney of having counseled his flight. Evidence Code section 958 provides, "There is no privilege under this article as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship." In *People v. Morris* (1971) 20 Cal.App.3d 659 [97 Cal.Rptr. 817], the court recognized that the privilege does not preclude the

attorney from defending an accusation that he misled his client. (See 20 Cal.App.3d at pp. 663-664; *Carlson, Collins, Gordon & Bold* v. *Banducci* (1967) 257 Cal.App.2d 212, 227-228 [64 Cal.Rptr. 915]; and Witkin, Cal. Evidence (1966) § 824, p. 771.) Finally it may be noted that the defendant, following his apprehension, failed to show that he had any ". . . sound reason for remaining away." (*Cureton* v. *United States, supra,* 396 F.2d at p. 676.)

In affirming the action of the trial court on this point we do not give unqualified approval to the action of the trial court in summarily plunging ahead. The judge gambled and won. In *People* v. *Connolly, supra,* the court admonished, "When looking to the initial proceedings involving the determination to proceed with trial, sufficient facts must be before the court to establish what reasonably appears to be a prima facie showing of voluntary absence. In the usual case a continuation of at least a few hours in order to locate defendant is appropriate." (36 Cal.App.3d at p. 385. See also *People* v. *Malloy, supra,* 41 Cal.App.3d 944, 954; *United States* v. *McPherson, supra,* 421 F.2d 1127, 1128; and *Cureton* v. *United States, supra,* 396 F.2d 671, 672-673.) Discretion may be the better part of valor in order to avoid the necessity of retrial in the event it is later determined that an excusable misunderstanding or emergency has occasioned the absence.

## II

It is axiomatic that a defendant accused of crime is entitled to the effective assistance of counsel. (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464-466 [34 Cal.Rptr. 863, 386 P.2d 487]; and *In re Greenfield* (1970) 11 Cal.App.3d 536, 541-546 [89 Cal.Rptr. 847].) Defendant acknowledges that he must show that his counsel's lack of diligence or competence reduced his trial to a farce or sham and prevented the presentation of a crucial defense. (See *People* v. *Reeves* (1966) 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35] [cert. den. (1966) 385 U.S. 952 (17 L.Ed.2d 229, 87 S.Ct. 332)]; *People* v. *Pena* (1972) 25 Cal.App.3d 414, 424-431 [101 Cal.Rptr. 804]; and *People* v. *Glover* (1967) 257 Cal.App.2d 502, 507-509 [65 Cal.Rptr. 219].) He contends, however, that his trial counsel failed in his duty to him, first, by his total disregard of the attorney-client privilege in discussing the reasons for his absence; and, second, by failure to object to numerous items of irrelevant and highly prejudicial evidence offered by the People.

-A-

 Under the provisions of section 952 of the Evidence Code the statement the defendant made to his attorney, concerning his apprehension that the prosecuting witness would show up to testify against him, arose out of the attorney-client relationship, and, as such, it was "a confidential communication between client and lawyer" within the meaning of that section. It was therefore privileged under the provisions of section 954. The client was the holder of the privilege under the provisions of section 953, but in his absence it was the duty of counsel to assert the privilege on his behalf by refraining from voluntarily disclosing the communication, and by positively asserting the privilege if queried. (Evid. Code, §§ 919 and 955; Jefferson, Cal. Evidence Benchbook, § 35.2, pp. 620-622.) Upon breach of that duty by counsel, the court should have disregarded the revealed statement and excluded it from evidence. (Evid. Code, § 916; and see *Stearns* v. *Los Angeles City School Dist.* (1966) 244 Cal.App.2d 696, 723 [53 Cal.Rptr. 482].)

The Attorney General suggests that counsel's statements and testimony at the trial were not improper. Section 956 provides that the privilege does not extend to communications of contemplated criminal acts or fraud. (See, e.g., *Abbott* v. *Superior Court* (1947) 78 Cal.App.2d 19, 21 [177 P.2d 317] [crime]; *Agnew* v. *Superior Court* (1958) 156 Cal.App.2d 838, 840 [320 P.2d 158] [fraud]; and note Witkin, *op. cit.*, § 821, pp. 768-769.) The People go to great length to attempt to establish that defendant's absenting himself from his trial was a contempt of court, punishable as such. (See Pen. Code, § 166, subd. 3; and *People* v. *Anderson* (1970) 6 Cal.App.3d 364, 367 [85 Cal.Rptr. 669].) They conclude that there was no privilege concerning any statement the defendant might make concerning his flight.

It is unnecessary to pursue that theory. Insofar as the defendant told his attorney that he was going to his car to get his sport coat there was no confidential communication, and the attorney could not be faulted for revealing that information to the court by either his unsworn or sworn statement. It is true that such revelation indicated that the defendant had been present, and had left, ostensibly to go to his car and return. There was nothing confidential about the defendant's whereabouts which were open to all to observe, and which, as it developed, were observed by the bailiff and by the prosecuting witness' mother. The gravamen of the attorney's statement and testimony was his revelation of the declaration which indicated his client's apprehension—consciousness of guilt. (See

part III below.) This statement was not a communication of intent to commit a crime or fraud, it was only circumstantial evidence of flight at best.

Nevertheless, it is possible to excuse the attorney's disclosure as necessary to protect the client's interest. It is arguable that in moving for a continuance the attorney was under a duty to reveal to the court all facts within his knowledge concerning the defendant's disappearance, and that even if he were not under such duty, it was no abuse of discretion, and an exemplary tactical choice, to reveal all the facts to the court in the hopes of securing time to communicate with his client and to induce him to return for trial or change of plea.

It is unnecessary to pursue the question of whether the attorney did in fact breach any duty owed his client. The disclosure did not prevent the defendant from securing a trial at which he could be present. The record shows that that result was occasioned by the defendant's voluntarily absenting himself and remaining away until apprehended. A continuance to locate the defendant or otherwise determine his motive in leaving would have been unavailing. (See part I above.) The dereliction, if such it was, of counsel was in no way prejudicial.

-B-

■ At the time the defendant was arrested, the arresting officer found a piece of tissue paper in his car which was similar in color and texture to that which had encased the amphetamine tablets which the defendant furnished the youthful prosecuting witness. Expert testimony was offered to show the similarity. The expert further testified at the instance of the prosecutor that certain stains on the tissue found in the car had been made by human seminal fluid. No objection was interposed on behalf of the defendant. He now points out that the admission of this irrelevant evidence was extremely prejudicial as it introduced sexual overtones into an incident which was otherwise focused on whether or not the defendant had actually furnished a dangerous drug to the minor. (See *Atwood* v. *Villa* (1972) 25 Cal.App.3d 145, 152-156 [101 Cal.Rptr. 508].) The People point out that proof of the similarity was relevant to corroborate the witness' testimony that the pills were furnished by the defendant. The further suggestion, that the testimony was relevant and competent to show a sexual motive in furnishing the pills to the young girl, of itself reveals a situation where the possibility of prejudice far outweighs any remote inference which reasonably could be drawn. Nor

is it rational to suggest that the introduction of such testimony was permitted for tactical reasons because it showed that the apparent spots on the paper were not related to drugs. (Cf. *People* v. *Hayes* (1971) 19 Cal.App.3d 459, 471 [96 Cal.Rptr. 879].)

Defendant now also criticizes his trial counsel's failure to object to testimony that the drug amphetamine can be injected with a hypodermic syringe, to his failure to conduct more extensive cross-examination of the prosecuting witness (without showing what unfavorable facts concerning her background and credibility could have been revealed) (cf. *In re Saunders* (1970) 2 Cal.3d 1033, 1048 [88 Cal.Rptr. 633, 472 P.2d 921]), and to his offer to plead the defendant to a lesser offense in his absence, in violation of established principles. (See *Boykin* v. *Alabama* (1969) 395 U.S. 238, 242 [23 L.Ed.2d 274, 279, 89 S.Ct. 1709]; and *In re Tahl, supra,* 1 Cal.3d 122, 131.) Defendant acknowledges that these latter shortcomings, although highly questionable, in fairness, cannot be characterized as incompetent.

A review of the record reflects that the failure to object to the expert's testimony was not such incompetency of counsel as to reduce the trial to a farce or sham or to deprive the defendant of a fundamental defense. The testimony concerning the furnishing and delivery of the drugs was clear and uncontradicted. Anything reflecting on defendant's motives was superfluous and could not have been determinative or influential on the jury's decision.

No merit is found in defendant's claim that he was deprived of his effective representation by counsel.

### III

Penal Code section 1127c provides, "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] °No further instruction on the subject of flight need be given." The court instructed the jury in the language of CALJIC 2.52 which substantially follows the wording of the statute.

■ Defendant contends that it was error to give this instruction because the jury heard no evidence relating to the reasons, good or bad, for his absence, and because it violated his Fifth Amendment right to remain silent. The jury did have evidence before it of defendant's absence. He had been present when the jury was selected and was absent when they reconvened the following day. It did not have before it the statement and testimony of defendant's attorney and the testimony of the prosecuting witness' mother which were received by the court out of the presence of the jury. In order for the trial to proceed it was necessary for the court to find that his absence was voluntary. The court did announce, "Ladies and gentlemen, as you have noticed, the defendant is not here. He .was here earlier this morning. It appears he has voluntarily left. Under the Constitution and the laws of the United States and the State of California, we are entitled to proceed in his absence since he is voluntarily absent, so we are going to proceed."

In *People* v. *Terry* (1970) 2 Cal.3d 362 [85 Cal.Rptr. 409, 466 P.2d 961] [cert. den. (1972) 406 U.S. 912 (32 L.Ed.2d 112, 92 S.Ct. 1619)], the defendant had escaped from jail before trial. The court observed that it is ". . . probable that only one who expects his guilt to be proved at trial will attempt an escape and that an innocent man will stay for trial in order to clear his name, and win lawful liberty. . . ." (2 Cal.3d at p. 395, fn. omitted.) There the court also noted, ". . . the question of time of escape goes to the weight to be given evidence of escape pending trial, not to its admissibility." *(Id.)* Similar considerations should apply to one who has voluntarily absented himself from his trial. (See also *People* v. *Cannady* (1972) 8 Cal.3d 379, 391-392 [105 Cal.Rptr. 129, 503 P.2d 585]; *People* v. *Caldera* (1959) 173 Cal.App.2d 98, 101 [342 P.2d 945]; and *People* v. *Mora* (1956) 139 Cal.App.2d 266, 274 [293 P.2d 522]. Cf. *People* v. *Fremont* (1937) 22 Cal.App.2d 292, 300 [70 P.2d 1005].) As distinguished from the case last cited, in this case there was some evidence of flight, and the instruction was properly given.

Defendant asserts that the instruction violated the defendant's right to be free of adverse inferences from his failure to testify. *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], fails to distinguish between the defendant's privilege against self-incrimination which is protected under the *Griffin* rule, and his right, and normally exercised privilege, to be present at trial with counsel and confront the witness against him. The flight instruction only permitted an inference to be drawn from the defendant's failure to be physically present. The jury ·

were expressly instructed not to consider or draw any inferences from his failure to testify.[5]

Even if there was error in advising the jury that defendant's absence was voluntary (see part II above), and in combining that statement with an instruction on flight, there was no prejudicial error. (Cal. Const., art. VI, § 13; Pen. Code, § 1258; and *People* v. *Watson* (1956) 46 Cal.2d 818, 834-837 [299 P.2d 243].) In the first place the evidence of commission of the offense was clear and uncontradicted, and it is not reasonably probable that the jury would have arrived at a different result had the instruction been deleted. In the second place, even if the instruction may have been of questionable validity on the evidence properly before the jury, the facts, as ultimately established, demonstrated that the defendant's absence was occasioned by consciousness of guilt. This is not to say that subsequent events can cure a prior error, but it indicates that if the premise on which the instruction was ·given was invalid, the defendant would have been entitled to a new trial on other grounds.

## IV

The court instructed the jury as set forth in the margin.[6]

■ Defendant complains that the third paragraph of the instruction, which in effect told the jury that if the pills contained any amphetamine there was a legally sufficient quantity of the drug to establish the offense, improperly removed that issue from the consideration of the jury. (See *People* v. *Leal* (1966) 64 Cal.2d 504, 512 [50 Cal.Rptr. 777, 413 P.2d 665].) There is some authority for the proposition that the prosecution must establish that even if pills contain a drug and are saleable, the

---

[5]CALJIC 2.60 and 2.61 were requested by defendant's counsel and were given by the court. The latter was given in the unrevised form condemned in *People* v. *Vargas* (1973) 9 Cal.3d 470 [108 Cal.Rptr. 15, 509 P.2d 959] (see *id.,* p. 477). As in *Vargas* that error was not prejudicial (*id.,* pp. 478-481).

[6]"Every person who unlawfully furnishes or attempts to furnish or offers to furnish to a minor any restricted dangerous drug in an amount sufficient to be used as a drug and with knowledge that the substance is a restricted dangerous drug, is guilty of a crime. [¶] Amphetamine is a restricted dangerous drug. [¶] There have been some questions asked about the quantity involved. The instruction I just read says this must be in an amount sufficient to be used as a drug. You might contrast this with possibly finding a trace of powder on an envelope which a chemist can analyze with a microscopic instrument. That would not be a sufficient quantity. But if in your decision on the evidence you decide that these three pills that were furnished—they will be with you in the jury room—and that a pill is something that people swallow and this has amphetamine, then that is sufficient quantity to come within the rule I have stated."

prosecution must establish that the ingestion of the pill will produce a drug effect. (See *People* v. *Johnson* (1970) 5 Cal.App.3d 844, 849 [85 Cal.Rptr. 238].) Other cases indicate that it is not the effect of the amount discovered which is material, but whether or not the substance is in a form which is more than a useless trace. (See *People* v. *Schenk* (1972) 24 Cal.App.3d 233, 236-239 [101 Cal.Rptr. 75]; and *People* v. *Pohle* (1971) 20 Cal.App.3d 78, 80-82 [97 Cal.Rptr. 364].)

It is not unnecessary to reconcile the foregoing precedents. In this case the expert testified that the pills in question contained amphetamine, that he did not make a quantitative examination but that the pills were capable of being used, and contained a usable amount. He was of the opinion from the reaction in his test that each contained more than five milligrams of amphetamine, which is the minimum amount used when the drug is prescribed. In response to a request by a juror the court permitted the expert to elaborate on his prior testimony without objection from defense counsel or any formal motion to reopen the People's case. Even if this testimony be disregarded, it was clear that the other uncontradicted evidence showed that the pills contained amphetamine in an amount sufficient to be used as a drug. There was therefore no prejudicial error in receiving the additional evidence, or in the court's interpolated instruction.

V ·

After the defendant was apprehended the matter of sentencing was continued for preparation and consideration of a probation report and disposition of his motion for a new trial. On April 9, 1974, the motion for a new trial was denied but the offense was reduced. (See fn. 1.) The probation report is not a part of the record, but the court at that time considered it, denied probation, suspended proceedings, and referred the defendant to the Department of Corrections for a diagnostic report, pursuant to the provisions of section 1203.03 of the Penal Code. The department recommended that the defendant be considered for probation on condition that he receive a suspended prison sentence and serve a period of local jail confinement under the work furlough program, and that he abstain from use of alcoholic beverages and not frequent places where alcohol is the chief item of sale.

■ Defendant complains that it was an abuse of judicial discretion to deny him probation. (See *People* v. *Wade* (1959) 53 Cal.2d 322, 336-339 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Valdivia* (1960) 182 Cal.App.2d

145, 147 [5 Cal.Rptr. 832]; and *People* v. *Hollis* (1959) 176 Cal.App.2d 92, 98-99 [1 Cal.Rptr. 293]. Cf. *People* v. *Giminez* (1975) 14 Cal.3d 68, 71-72 [120 Cal.Rptr. 577, 534 P.2d 65].) In *Wade* the court indicated that it was not considering what might be in the probation report (53 Cal.2d at p. 338). In this case, on the other hand, the court after having considered the probation report at the earlier hearing, indicated on July 10, 1974, when the defendant was sentenced, that it had considered the probation report again and the report of the Department of Corrections. It did give reasons for denying probation. At the hearing the judge stated that he considered the seriousness of the offense, prior charges of drug abuse against defendant, which although they did not result in a conviction, showed that the defendant was familiar with the law, the fact that he had absented himself from his trial and had caused a loss to a friend who gave his bondsman security, and his apparently false statement that his trial counsel had advised him to flee.

No good purpose would be served by reviewing the facts in the report of the Department of Corrections which place in favorable perspective the defendant's old and virtually insignificant criminal record, his service record, including a good conduct medal, his apparently blameless life as a fugitive, and his employment record and vocational evaluation. The diagnostic study recommendation is not binding on the court. (See *People* v. *Martino* (1931) 113 Cal.App. 661, 663-664 [299 P. 86].) There were ample facts before the court to warrant a grant of probation, but the fact that reasonable minds, even the individuals on this court, might come to that conclusion, does not warrant an interference with the discretion exercised by the sentencing court when it has considered all facts bearing on the offense and the defendant to be sentenced. (See *People* v. *Ozene* (1972) 27 Cal.App.3d 905, 914-915 [104 Cal.Rptr. 170]; *People* v. *Ingram* (1969) 272 Cal.App.2d 435, 438-440 [77 Cal.Rptr. 423]; and *People* v. *Hollis, supra,* 176 Cal.App.2d 92, 96-97.)

No reversible abuse of discretion is found in the denial of probation.

## VI

■ Section 11912 (now § 11379) of the Health and Safety Code provides for a prison sentence of from five years to life, and also prescribes that a convicted offender who is sentenced to prison shall serve a minimum of three years before being considered for parole. This contrasts with the ordinary five-to-life sentence which under the provisions of section 3049 of the Penal Code carries with it a minimum

eligible parole date of 20 months or one-third of the minimum term. Defendant, while acknowledging the validity of that portion of the section which prescribes the minimum and maximum prison term, specifically attacks the provision which requires that a first offender serve three years before becoming eligible for parole. He states his basic argument as follows: "§ 11379 applies to an immense range of criminal conduct, much of which is extremely serious antisocial behavior, but also much of which is comparatively minor. The life maximum 'top' gives the Adult Authority the power to recognize the serious offenders, but the mandatory three year provision denies it the corresponding power to cope with the minimum offenders, such as the appellant clearly is. This arbitrariness violates the California Constitutional prohibition against cruel and unusual punishment."

We are mindful that in *People* v. *Serna* (1975) 44 Cal.App.3d 717 [118 Cal.Rptr. 904] [hg. den., Mar. 19, 1975, Tobriner, J. for hg.], the requirement of service of a minimum of three years imprisonment for a sale of heroin in violation of section 11352 of the Health and Safety Code was upheld against similar constitutional attack, and that in *People* v. *Waters* (1975) 52 Cal.App.3d 323 [125 Cal.Rptr. 46], the court followed *People* v. *Serna, supra,* and upheld the mandatory minimum service requirements of section 11379. (See also *People* v. *Carbonie* (1975) 48 Cal.App.3d 679, 686-689 [121 Cal.Rptr. 831] [hg. den., July 23, 1975]; and note *People* v. *Martinez* (1975) 46 Cal.App.3d 736, 743 [120 Cal.Rptr. 362].)* For the reasons set forth below we are compelled to disagree with the foregoing decisions as applied to the instant case.

The penological purpose behind the California indeterminate sentencing laws (including Health & Saf. Code, § 11379) was set forth as early as 1918 in *In re Lee,* 177 Cal. 690 [171 P. 958]. The court stated, "It is generally recognized by the courts and by modern penologists that the purpose of the indeterminate sentence law, like other modern laws in relation to the administration of the criminal law, is to mitigate the punishment which would otherwise be imposed upon the offender.

---

*Since the foregoing was prepared, the Court of Appeal in the Third District has upheld a six-year mandatory minimum sentence without possibility of parole for a conviction of possession of heroin for sale in violation of former section 11500.5 (now § 11351) of the Health and Safety Code with an admitted conviction of one prior felony narcotic offense. (*In re Heredia* (1975) ▮(Cal.App.).) It has also struck down as unconstitutional a five-year mandatory minimum sentence without possibility of parole for conviction of mere possession of heroin in violation of former Health and Safety Code section 11500 (now § 11350) with a prior felony drug conviction. (*In re Carter* (1975) ▮(Cal.App.).)

These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime. They endeavor to put before the prisoner great incentive to well-doing in order that his will to do well should be strengthened and confirmed by the habit of well-doing." (177 Cal. at p. 692. See also *In re Foss* (1974) 10 Cal.3d 910, 923 [112 Cal.Rptr. 649, 519 P.2d 1073]; and *In re Rodriguez* (1975) 14 Cal.3d 639, 652 [122 Cal.Rptr. 552, 537 P.2d 384].)

In *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880] [cert. den. (1972) 406 U.S. 958 [32 L.Ed.2d 344, 92 S.Ct. 2060]], the court said: "Historical analysis suggests that the framers intended to outlaw both cruel punishments and punishments of excessive severity for ordinary offenses." (6 Cal.3d at p. 646.) Shortly thereafter in *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921], the court set forth a three-part test to be used in determining whether a penalty is excessively severe. In passing upon the validity of a penalty, the factors to be considered are the nature of the offense and of the offender, the penalties imposed in the same jurisdiction for other offenses, and the penalties imposed in other jurisdictions for the same offense. (8 Cal.3d at pp. 425-427.) These factors may now be reviewed.

A. The nature of the offense and of the offender.

Considered in the abstract, a violation of section 11379 of the Health and Safety Code is a serious crime. This statute condemns, among others, those who sell or manufacture dangerous drugs. Many of the people convicted under its provisions will be major offenders who make a profit selling or manufacturing large quantities of drugs.

Appellant, however, was not a major offender or dangerous character. He furnished only a small amount of a nonaddictive substance; although there was a potential for harm (had the minor taken the drugs) no harm actually resulted. Appellant was not a drug user and had only a minimal criminal record. The Department of Corrections found that he was not a threat to the community and characterized his offense as the result of "a mistake in judgment."

The problem thus arises whether the key element of the first prong of the *Lynch* test is the nature of the offense or the nature of the offender. If the nature of the offense is the dominant factor, then the provision requiring three years in prison as a prerequisite of eligibility for parole is probably justified. But if the nature of the offender is the dominant

factor, the provision in question may well impose an excessive penalty on the appellant in this case.

It seems that the nature of the offender should be given greater weight than the nature of the offense. In *In re Foss, supra,* 10 Cal.3d 910, the court said: "In addition, as pointed out above, also relevant to determining whether a sentence is disproportionate to the offense and offender, is a consideration of the penological purposes of the punishment imposed in light of the particular offense." (10 Cal.3d at p. 923.) This proposition that a punishment is not valid unless it serves a penological purpose, was supported by Mr. Justice Brennan in his concurring opinion in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726]. There he wrote, "Although the determination that a severe punishment is excessive may be grounded in a judgment that it is disproportionate to the crime, the more significant basis is that the punishment serves no penal purpose more effectively than a less severe punishment." (408 U.S. at p. 280 [33 L.Ed.2d at pp. 372-373], fn. omitted.)

The recognition of the basic purpose of the indeterminate sentence law as enunciated in *In re Lee, supra,* in the more recent cases of *In re Foss, supra,* and *In re Rodriguez, supra,* makes clear that punishment imposed under the California laws is to be geared to the individual prisoner, in an effort to make him into a better citizen. As most recently stated in *In re Rodriguez, supra,* 14 Cal.3d 639, ". . . [b]oth the Eighth Amendment and article I, section 17, proscribe punishment which is proportionate to the particular offense." (14 Cal.3d at p. 652. See also *People* v. *Wingo* (1975) 14 Cal.3d 169, 183 [121 Cal.Rptr. 97, 534 P.2d 1001].) Where a statute, such as section 11379 of the Health and Safety Code, encompasses offenses reflecting a wide range of culpability, a parole ineligibility provision which precludes recognition of those gradations of culpability may be unconstitutional. (See *In re Foss, supra,* 10 Cal.3d 910, 929; and *People* v. *Malloy, supra,* 41 Cal.App.3d 944, 954-956. Note *In re Rodriguez, supra,* 14 Cal.3d at p. 648.)

*In re Foss, supra,* recognized that in the situation of a second offender a denial of parole consideration for three years might allow for consideration of the rehabilitative progress of the offender (10 Cal.3d at p. 929). As noted above, *People* v. *Serna, supra,* and *People* v. *Waters, supra,* approve the three-year ineligibility provision for a first offender. In the former case it is suggested that the extra 16 months mandatory incarceration imposed by the minimum parole eligibility date is not constitutionally noticeable. (44 Cal.App.3d at p. 721; and see *People* v.

*Waters, supra,* 52 Cal.App.3d. at p. 333.) Although 16 months may be *de minimis* when viewed in the light of a life sentence which carries a minimum eligibility term of 7 years or 84 months (see Pen. Code, § 3046), if consideration is given to the gradations of the offense, it amounts to a 75 percent increase in the punishment ordinarily imposed for the lowest grade of other offenses punishable by a minimum term of 5 years. Or conversely, those convicted of other offenses with such a minimum term will only serve 55 percent of the term demanded of defendant. While this extra penalty may be constitutionally justified for the heroin seller involved in *Serna,* or the sellers of 25,000 amphetamine pills for $2,000 involved in *Waters,* it is incongruous to require the same minimum from the defendant in this case who gave away three pills of little more than prescription strength. (See also part V above.)

"We recognize that rehabilitation is not the only purpose behind the imposition of punishment by imprisonment for criminal offenses. In *People* v. *Anderson, supra,* . . . we noted two additional legitimate purposes of the penal laws; isolation of the offender from the society, and deterrence." (*In re Foss, supra,* 10 Cal.3d at p. 924.) Neither of these purposes, however, is sufficient in itself to justify the incarceration of appellant for as much as three years. He is evidently not a threat to society so there is no need to isolate him for the protection of others. The restriction on the power of the Adult Authority to grant early parole is not needed to deter others from furnishing dangerous drugs—the five years to life penalty will be sufficient.

B. Comparison of the penalty imposed under section 11379 with the penalties imposed in California for other offenses

In California, through the operation of Penal Code section 3049, one convicted of second degree murder (Pen. Code, § 190), first degree robbery (Pen. Code, § 213), or first degree burglary (Pen. Code, § 461) is eligible for parole after 20 months in prison. One convicted of second degree robbery (Pen. Code, § 213), assault with intent to murder (Pen. Code, § 217), rape (Pen. Code, § 264), lewd acts with a child (Pen. Code, § 288), arson of a dwelling (Pen. Code, § 447a), or second degree burglary (Pen. Code, § 461) is eligible for parole after he has served one year.

All of these offenses are more serious than that committed by appellant. Indeed, it seems very odd to class appellant with robbers, burglars, rapists, or arsonists. Yet they can be paroled before he can.

Thus, the penalty imposed on him is not in proportion to the penalties imposed for other serious crimes in California.

The Attorney General seeks to justify the discrepancy on the theory that only punishments out of all proportion to other penalties may be reviewed or struck down. (See *In re Lynch, supra,* 8 Cal.3d 410, 424; *People* v. *Waters, supra,* 52 Cal.App.3d 323, 333; *People* v. *Serna, supra,* 44 Cal.App.3d 717, 721; *In re Jones* (1973) 35 Cal.App.3d 531, 539-542 [110 Cal.Rptr. 765]; and *In re Maston* (1973) 33 Cal.App.3d 559, 564-565 [109 Cal.Rptr. 164].) He states that a year or two difference patently is not excessive. This depends upon through which end of the spyglass one looks. As we have seen the punishment for minimum gradations of given offenses are grossly disproportionate and that is what this case is all about.

C. Comparison with other states

The last step is to compare the time in prison required for eligibility for parole under section 11379 with the time required for eligibility for parole under analogous statutes in other states. Both defendant and the People have provided appendices to their briefs which show the penalties for drug offenses in other states. However, the data furnished by defendant does not match those furnished by the Attorney General.

Accepting the data furnished by the People it appears that there are only five other states beside California which require a person convicted for the first time of selling narcotics to serve as many as three years in prison before becoming eligible for parole. They are Arizona, Colorado, Indiana, Nebraska and Oklahoma. Only one state, Colorado, requires a first offender to serve more than five years before becoming eligible for parole. Thus, the mandatory minimum term imposed for a violation of Health and Safety Code section 11379 is as stated in *In re Foss, supra,* "more severe than that imposed by the vast majority of the states of the Union. This provides us with further indication that the penalty is excessive." (10 Cal.3d at p. 928.)

Again the Attorney General assumes that the evident discrepancies are constitutionally insignificant without considering their effect on the least culpable offender.

In conclusion we find that under the facts of this case it is unconstitutional to apply a 36-month, as distinguished from a 20-month denial of eligibility for parole.

The judgment of conviction is affirmed and the Department of Corrections is directed to consider the defendant's minimum eligible date for parole under the provisions of section 3049 of the Penal Code, rather than as provided in former section 11912 (now § 11379) of the Health and Safety Code.

Molinari, P. J., and Elkington, J., concurred.