[Crim. No. 34364. Second Dist., Div. Two. Aug. 8, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFRED JEROME MARTIN, Defendant and Appellant.

COUNSEL

Jonathan Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Ronald N. Ito, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BEACH, J.**—After a jury trial in which appellant was found guilty of second degree murder, he was sentenced to state prison. He appeals. We affirm.

FACTS:

On April 16, 1978, appellant was staying temporarily with his sister, Sharon Martin, and her boy friend, Tyrone Labostrie, at their apartment in Long Beach. At 7:30 that evening, all three were at the apartment. Also present were two guests: Ernest Hobbs and his fiancee, Deborah Martin (no relation to appellant). Appellant kept staring at Deborah Martin.

Around 8 p.m., the three men started playing a game of dominoes. During the game, appellant told Hobbs: "You mother fucker. What are you doing with that white bitch," a reference to Deborah Martin. Hobbs asked, "What did I do to offend you? I am sorry, man." Responding, "I will blow your mother fuckin' head off," appellant then pulled a gun out of his belt area and shot at Hobbs but missed him. The bullet instead hit a large glass. Thereafter, Labostrie saw appellant point the gun at Hobbs' head and pull the trigger, but the gun did not go off. When appellant again pulled the trigger, a bullet hit Hobbs in the head. Hobbs fell. There was blood on the left side of his head. As Labostrie was taking his little daughter out of the room, he heard another shot.

Saying, "Ernie is dead," appellant pushed Deborah Martin to the floor, pulled her by the hair and, calling her a white bitch, hit her on the head with the gun. Sharon Martin called the police.

Officer Jerry A. Lomeli of the Long Beach Police Department was the first to arrive at the scene. He was joined 10 seconds or so later by Officer Boydston. As the officers approached the apartment where the shooting had occurred, Officer Lomeli saw appellant appear in the doorway of the apartment, holding a gun. Appellant then retreated into the apartment. While standing outside the apartment, Officer Lomeli saw appellant sitting on a couch. Remaining outside the apartment, Officer Lomeli ordered appellant to stand up and to lie face down on the ground with his hands to his side. Appellant did so. Officer Boydston then entered the apartment and handcuffed appellant. Upon entering the apartment, Officer Lomeli observed Hobbs slumped over a bean bag chair. Hobbs was bleeding heavily. A knife and a gun were lying in the hallway leading to the bedroom.

An autopsy performed on Hobbs by Dr. Joseph Lawrence Cogan of the Los Angeles County Coroner's office showed that Hobbs had died as the result of two gunshot wounds in the head.

### APPELLANT'S CONTENTIONS:

Appellant (1) seeks to apply the new *"Drew"* test of insanity to his case, (2) claims the trial court erred in failing to grant a new self-defense instruction based on *People v. Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1], and (3) contends he should have been committed to the Youth Authority.

### DISCUSSION:

1. *Insanity Test Under Drew*

■ Appellant contends that under *People v. Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318], this case should be remanded to the trial court for a trial on the issue of insanity. We reject the contention. *Drew*, which sets forth a new insanity test for California, was decided in September 1978, after trial in this case. Before *Drew*, the insanity defense in California was governed by the M'Naghten test: whether the accused knew or understood the quality and nature of his act or knew that it was wrong. In *Drew*, the California Supreme Court repudiated that test and instead adopted the American Law Institute (ALI) formulation. *Drew* stated that the primary reason for abandoning the M'Naghten test was its exclusive focus on the cognitive capacity to distinguish right from wrong while ignoring those types of mental ill-

nesses where the individual knows what he is doing is wrong but cannot control his will or emotions. (*People* v. *Drew, supra*, at pp. 342-344; *People* v. *Schneider* (1979) 95 Cal.App.3d 671, 680 [157 Cal.Rptr. 314].) Under the ALI test, a person is not responsible for criminal conduct "'if at the time of such conduct and as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.'" (*People* v. *Drew, supra*, 22 Cal.3d 333, 345.) The ALI test clearly adds a volitional element, the ability to conform to legal requirements, which is missing from the M'Naghten test. In addition, it "avoids the all-or-nothing language of M'Naghten and permits a verdict based on lack of substantial capacity." (*Id.* at p. 346.) The ALI test thus has elements of volition as well as cognition. (*People* v. *Wischemann* (1979) 94 Cal.App.3d 162, 168 [156 Cal.Rptr. 586]; *People* v. *Sanders* (1979) 98 Cal.App.3d 273, 276 [159 Cal.Rptr. 413].)

*Drew* expressly states that its holding applies retroactively "only to those cases not yet final in which the defendant has pled not guilty by reason of insanity and to cases that have not yet come to trial as of the date of the finality of this opinion." (*People* v. *Drew, supra*, 22 Cal.3d 346, 348.) In the case at bench, appellant did not enter or tender a plea of not guilty by reason of insanity. Therefore, *Drew* has no retroactive application to this case. (*People* v. *Foster* (1980) 102 Cal.App.3d 882, 895 [162 Cal.Rptr. 623].)

Appellant claims that no plea of not guilty by reason of insanity was entered because his counsel believed to do so would be fruitless in light of the report from Dr. Saul J. Faerstein, the court-appointed psychiatrist, that appellant was not insane under the M'Naghten test. Under those circumstances, appellant argues, he is entitled to a remand for a trial on the issue of insanity under the new test of *Drew*. In support of his argument, appellant cites *People* v. *Sanders, supra*, 98 Cal.App.3d 273. In *Sanders*, the defendant withdrew his plea of not guilty by reason of insanity after receipt of the preliminary psychiatric reports indicating that he was sane under the M'Naghten test. The *Sanders* court held that under the circumstances of that particular case the defendant was entitled to a remand on the issue of insanity based on the *Drew* test. The court in *Sanders* emphasized that the defendant in that case "should be distinguished from a defendant who withdraws his plea of not guilty by reason of insanity *before* psychiatrists or psychologists have been appointed to examine the defendant and have in fact examined the defendant and submitted reports." (Italics added.) (*Id.* at

p. 277.) Here, appellant pleaded not guilty on May 23, 1978. The psychiatric report in question was prepared on June 29, 1978. Unlike the defendant in *Sanders*, appellant never entered a plea of not guilty by reason of insanity. The holding of *Sanders*, therefore, is inapplicable to the case at bench. Moreover, under the *Drew* test a person is not deemed responsible for criminal conduct if as the result of a *"'mental disease or defect* he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.'"* (Italics added.) (*People v. Drew, supra,* 22 Cal.3d 333, 345.) The psychiatric report in this case indicated that appellant was not suffering from any mental disease or defect.

Here appellant's sole claim at trial, relative to his mental state, was that he "blacked out." Presumably this would demonstrate that he lacked the *capacity* to form an intent. The defense and the evidence produced was not that because of mental disease appellant could not conform his conduct to the law. It is this latter condition that *Drew* recognizes as a consequence of insanity and available as a defense. Based on the facts of this case, *Drew* simply does not apply. It seems that appellant is seeking a retrial not to enable him to testify more fully but to enable him to testify *differently.* We get this impression because *different* facts instead of *additional* facts would have to be presented in order to produce the psychiatric opinion sought by appellant, to wit, that appellant could not conform his conduct to the law because of mental disease or defect.

### 2. *Applicability of the Flannel Decision*

■ Citing *People v. Flannel, supra,* 25 Cal.3d 668, appellant argues he is entitled to a new trial to raise the defense that his honest though unreasonable belief that he was acting in self-defense[1] negated malice, thus reducing the offense to manslaughter. In *Flannel*, the California Supreme Court held that in murder cases *not yet tried* a trial court must instruct *sua sponte* that a defendant's honest but unreasonable belief in the need to defend negates malice and reduces the offense to manslaughter. (*Id.* at p. 683.) *Flannel* thus clearly applies prospectively only. The case at bench was tried one year before the *Flannel* decision. *Flannel*, therefore, does not apply here.

---

[1]Sharon Martin, a prosecution witness, testified that the victim possessed a "little knife" but that she did not see him take it out when appellant was pointing the gun at him. Appellant testified on his own behalf. There were no other defense witnesses. Appellant did not recall seeing the victim with a knife; he was suffering from a blackout.

As the *Flannel* court recognized when it held that its holding was to apply prospectively only, "'[t]he judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts.' [Citation omitted.] Given the undeveloped state of the unreasonable belief rule, we cannot impose upon the instant trial court so formidable a duty as to conceive and concoct an instruction embodying that rule. 'The duty of the trial court involves percipience—not omniscience.' [Citations omitted.]" (*People* v. *Flannel, supra*, 25 Cal.3d 668, 683.)

### 3. *Referral to Youth Authority*

 Finally, appellant contends the trial court abused its discretion in sentencing him to state prison rather than referring him to the Youth Authority as called for under Welfare and Institutions Code section 1731.5. That section reads: "After certification to the Governor as provided in this article a court *may* commit to the authority any person convicted of a public offense who comes within subdivisions (a), (b), and (c), or subdivisions (a), (b), and (d), below:

"(a) Is found to be less than 21 years of age at the time of apprehension.

"(b) Is not sentenced to death, imprisonment for life, imprisonment for 90 days or less, or the payment of a fine, or after having been directed to pay a fine, defaults in the payment thereof, and is subject to imprisonment for more than 90 days under the judgment.

"(c) Is not granted probation.

"(d) Was granted probation and probation is revoked and terminated.

"The Youth Authority shall accept a person committed to it pursuant to this article if it believes that the person can be materially benefited by its reformatory and educational discipline, and if it has adequate facilities to provide such care." (Italics added.)

The use of the word "may" in the section indicates that certification to the Youth Authority by the trial judge is discretionary rather than mandatory. (*People* v. *Doyle* (1952) 108 Cal.App.2d 827, 828 [240 P.2d 40].) On appeal, the trial court's decision will not be disturbed in the absence of an abuse of discretion. (*People* v. *Hutson* (1963) 221

Cal.App.2d 751, 754 [34 Cal.Rptr. 790]; *People* v. *Binder* (1955) 135 Cal.App.2d 662, 666 [288 P.2d 48].) The standard for exercise of that discretion is the offender's suitability for the rehabilitative program of the Youth Authority; the social interests usually involved in fixing sentence would also play a part. (*People* v. *Hutson, supra*, at pp. 754-755.)

In this case, the diagnostic report which was prepared by the Department of Corrections pursuant to Penal Code section 1203.03, and which has been made a part of the record on appeal, recommended that the 20-year-old appellant be committed to the Youth Authority in view of his age and his lack of criminal sophistication. The recommendations contained in the Department of Corrections' diagnostic report, however, are not binding upon a trial judge. (*People* v. *Vargas* (1975) 53 Cal. App.3d 516, 533 [126 Cal..Rptr. 88]; see also *People* v. *Taylor* (1978) 81 Cal.App.3d 973, 976 [146 Cal.Rptr. 821]; and *People* v. *Carl B.* (1979) 24 Cal.3d 212, 217-218 [155 Cal.Rptr. 189, 594 P.2d 14] (diagnostic study prepared by the Youth Authority not binding upon trial court).) It is obvious from the record that the trial judge here did consider referral to the Youth Authority. Following argument by both counsel as to the propriety of a Youth Authority commitment, the trial judge stated: "All right. Thank you, gentlemen. I have anguished some over the decision that I knew I would have to make in this case, because it is, in my mind, a close case. I have decided that the adult authority is the proper place for Mr. Martin because of the enormity of the crime and because of his age and because of what appears to me in the reports to be a lack of remorse; accordingly, probation will be denied to Mr. Martin."

In view of appellant's apparent lack of remorse for the unprovoked murder of Hobbs, it cannot be said that the trial court abused its discretion when it decided that state imprisonment, the purpose of which is to punish (Pen. Code, § 1170), would in this particular instance be more appropriate than a referral to the Youth Authority, which has rehabilitation as its main objective (*People* v. *Binder, supra*, 135 Cal.App.2d 662, 664.) The trial judge's understandable desire to impose a substantial period of confinement for society's protection could not have been fulfilled by a Youth Authority commitment. As the Attorney General notes, appellant, who was 20 years and 6 months of age when sentenced on November 17, 1978, could have been confined to the Youth Authority for a period no longer than his 25th birthday on May 6, 1983 (Welf. & Inst. Code, § 1771), a total of 4-1/2 years, with an

extended commitment possible only if the Youth Authority established that appellant remained dangerous to the public (Welf. & Inst. Code, § 1800). In comparison, appellant's confinement to state prison was for a substantially longer period, namely, a total of eight years, consisting of six years (the middle term) on the underlying offense, plus a two-year enhancement for personally using a firearm in the commission of the offense (Pen. Code, § 12022.5).

Under the circumstances, the trial court did not abuse its discretion in sentencing appellant to state prison rather than referring him to the Youth Authority.

The judgment is affirmed.

Fleming, Acting P. J., and Compton, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied October 1, 1980.