[Crim. No. 42958. Second Dist., Div. Four. Dec. 12, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
BRUCE CAROL WELLS, JR., Defendant and Appellant.

COUNSEL

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert F. Katz and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McCLOSKY, J.—A jury found appellant Bruce Carol Wells, Jr., guilty of voluntary manslaughter (Pen. Code, § 192), a lesser but necessarily includ-

ed offense of murder (Pen. Code, § 187), the crime with which he was charged in count I of the information. It also found appellant guilty of kidnaping (Pen. Code, § 207) as charged in count II, and further found true the allegations that he used a firearm during the commission of the crimes of voluntary manslaughter and kidnaping (Pen. Code, §§ 12022.5 and 1203.06, subd. (a)(1)). The jury found that appellant was not guilty of assault with a deadly weapon or force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)) as charged in count III of the information.

Appellant was sentenced to state prison for a total of eight years. For his crime of voluntary manslaughter (count I), the high term of six years was imposed, and a two year enhancement was added for his use of a firearm. For his crime of kidnaping (count II) and for his use of a firearm during the commission of that kidnaping, appellant was sentenced to five and two years, respectively, for a total of seven years. The sentence in count II was ordered to run concurrently with that imposed in count I. Appellant was given presentence credit of 276 days. He now appeals from the judgment of conviction.

## CONTENTIONS ON APPEAL

Appellant contends (1) that the trial court committed reversible error per se in restricting his trial counsel's examination of prospective jurors during voir dire, (2) that the trial court abused its discretion in not committing appellant to the California Youth Authority (CYA) as per the probation officer's recommendation, considering that the court completely ignored the issue of appellant's suitability for the rehabilitative program of the CYA, and (3) that the trial court committed reversible error in failing to state reasons for sentencing appellant to state prison for the high base term.

## DISCUSSION

## I

During voir dire of the prospective jurors, the trial judge precluded appellant's trial counsel from asking the following questions:

1. "Just recently we had an election, and on the ballot was a Proposition 8. [¶] What caused you to vote the way you did? I take it—if you did in fact vote."

2. "[T]he current administration has cutback on the justice department's enforcement of the civil rights violations. What are your opinions of that?"

3. "Should a person in business be required to hire minorities in order to obtain government contracts[?]"

4. "What do you think of Playboy Magazine[?]"

5. "Why are there so few blacks in professional golf and tennis [?]"

6. "Why are there so few blacks president [*sic*] of large corporations?"

7. "Why has there never been a black governor in California?"

8. "Should have Chief Gates apologized for his . . . [statement] regarding the police chokehold and the effect on minorities?"

9. "What is the most important aspect of Proposition 8?" Appellant contends that this was reversible error per se.

Appellant's trial counsel told the trial jury: "I believe in today's society that there is prejudice, hostility towards blacks by the white majority. I think that it's necessary to find out if an individual is prejudiced against blacks, and I do not want the juror to answer a question on the basis of what I want to hear."

Appellant is black and the woman he was convicted of killing was white.

The Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution guarantee a trial by a fair and impartial jury. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748].) " '[E]very person put upon trial upon an issue involving his life or his liberty is entitled to have such issue tried by a jury consisting of unbiased and unprejudiced persons.' " (*Id.*, at p. 266, quoting *People* v. *Bennett* (1926) 79 Cal.App. 76, 91 [249 P. 20], disapproved on other grounds in *People* v. *Love* (1960) 53 Cal.2d 843, 852 [174 Cal.Rptr. 317, 628 P.2d 869].)

"[P]rospective jurors who bring to the courtroom a bias concerning the particular case on trial or the parties or witnesses thereto" must "be excused from the jury insofar as possible." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 274.)

"The purpose of the challenges also dictates their scope: they are to be used to remove jurors who are believed to entertain a specific bias, and no others." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 274.) "[A] party will use a peremptory challenge only when he believes that the juror he removes

may be consciously or unconsciously biased against him, or that his successor may be less biased." (*Id.,* at p. 275; fn. omitted.)

In *People* v. *Williams* (1981) 29 Cal.3d 392, 407 [174 Cal.Rptr. 317, 628 P.2d 869], our Supreme Court, being cognizant of the need to be able to unearth such bias, held that "counsel should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges[1] whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause."

The *Williams* court explained: "Our courts have become increasingly aware that bias often deceives its host by distorting his view not only of the world around him, but also of himself. Hence, although we must presume that a potential juror is responding in good faith when he asserts broadly that he can judge the case impartially (*People* v. *Preston* (1973) 9 Cal.3d 308, 313 [107 Cal.Rptr. 300, 508 P.2d 300]), further interrogation may reveal bias of which he is unaware or which, because of his impaired objectivity, he unreasonably believes he can overcome. And although his protestations of impartiality may immunize him from a challenge for cause (see Pen. Code, § 1076), they should not foreclose further reasonable questioning that might expose bias on which prudent counsel would base a peremptory challenge. . . . [Fns. omitted.]

"  . . . . . . . . . . . . . . . . . . . . . . .

"Because the peremptory challenge is a critical safeguard of the right to a fair trial before an impartial jury (see *Swain* v. *Alabama* (1965) 380 U.S. 202, 219-221 [13 L.Ed.2d 759, 771-773, 85 S.Ct. 824]; *Pointer* v. *United States* (1894) 151 U.S. 396, 408 [38 L.Ed. 208, 213-214, 14 S.Ct. 410]), questions directed at its intelligent exercise manifestly fall within the bounds of the 'reasonable inquiry' to which counsel are entitled. (Pen. Code, § 1078.)

" '[I]f [the constitutional right to an impartial jury] is not to be an empty one, the defendants must, upon request, be permitted sufficient inquiry into the background and attitudes of the jurors to enable them to exercise intelligently their peremptory challenges. [Citations.]' " (*People* v. *Williams, supra,* 29 Cal.3d 392, 402-405.)

---

[1]"A peremptory challenge . . . is an objection to a juror for which no reasons need be given, but upon which the Court must exclude him." (Pen. Code, § 1069.) While no reason need be given for the exercise of a peremptory challenge, it is not an objection "for which no reason need *exist.*" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 274; italics in original.)

A challenge for cause is either general—the juror is disqualified from serving in any case—or particular—the juror is disqualified from serving in the particular matter on trial. (Pen. Code, § 1071; see also Pen. Code, §§ 1072, 1073, 1074, 1076.)

The *Williams* court left intact "the considerable discretion of the trial court to contain voir dire within reasonable limits." The *Williams* court noted that "the court need allow only *reasonable* questions—although it cannot exclude questions proper in scope, it is free to require that they be phrased in neutral, nonargumentative form. On the other hand, a question fairly phrased and legitimately directed at obtaining knowledge for the intelligent exercise of peremptory challenges may not be excluded merely because of its additional tendency to indoctrinate or educate the jury." (*People* v. *Williams, supra,* 29 Cal.3d at p. 408.)

■ The critical inquiry remaining in such cases is whether the questions a defendant's trial counsel was precluded from asking during voir dire of the prospective jurors are relevant and substantially likely to uncover such racial, religious or ethnic bias. (*People* v. *Williams, supra,* 29 Cal.3d at pp. 410, 412.) In this case, that inquiry concerns questions substantially likely to uncover racial prejudice against black persons. If this inquiry is answered affirmatively as to any of such questions, appellant will have been deprived of his right to secure an impartial jury, and reversal will be mandated. (*Id.,* at p. 412.) " 'The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' " (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 283, quoting *People* v. *Riggins* (1910) 159 Cal. 113, 120 [112 P. 862].)

We now review the proffered questions in light of the foregoing legal principles.

The question regarding Playboy magazine was irrelevant and was, therefore, properly excluded.

The two questions involving Proposition 8 were properly excluded. The first of these—what caused you to vote the way you did on Proposition 8?—clearly impinges on a juror's constitutional right to privacy. (Cal. Const., art. I, § 1; see generally, *Lehman* v. *City and County of San Francisco* (1978) 80 Cal.App.3d 309 [145 Cal.Rptr. 493].) Moreover, it indirectly calls for the revelation of privileged matter. (See Evid. Code, § 1050.) The relevance of the second question involving Proposition 8—what is the most important aspect of Proposition 8?—is questionable. Nevertheless, assuming arguendo, that it is relevant, the question is so tenuous, broad and unfocused that the likelihood that it would expose racial bias is less than substantial.

The questions regarding the current administration's cutback on the justice department's enforcement of civil rights violations, the hiring of mi-

norities as a prerequisite to obtaining government contracts, and whether Chief Gates should have apologized for his statement regarding police chokeholds and their effect on minorities are each arguably relevant and might well have been permitted. While all the questions with the exception of the question pertaining to Playboy magazine had a possible potential for exposing racial bias, each, other than questions 5, 6, and 7 which we discuss below, was unfocused, overbroad, so tenuous and so intertwined with economic or political and personal liberty concerns that the answer to any of these questions would not have been substantially likely to uncover racial bias.

Questions 5, 6, and 7 are another matter. These questions read respectively as follows: "5. Why are there so few blacks in professional golf and tennis?"; "6. Why are there so few blacks president [sic] of large corporations?" and "7. Why has there never been a black governor in California?" Each of these questions was relevant and substantially likely to uncover racial bias or prejudice, especially if followedup by reasonable questions testing the reasons for such answers as the prospective jurors would have given for them.

Because racial, religious or ethnic prejudice or bias is a thief which steals reason and makes unavailing intelligence—and sometimes even good faith efforts to be objective—trial judges must not foreclose counsel's right to ask prospective jurors relevant questions which are substantially likely to reveal such juror bias or prejudice, whether consciously or unconsciously held. We, therefore, conclude that the trial judge abused his discretion in precluding appellant's trial counsel from asking questions 5, 6, and 7, and that a reversal is compelled.

Because we reverse, we need not decide the merits of appellant's remaining contentions. For the guidance of the trial court on retrial, however, we discuss them.

## II

Appellant contends that the trial court abused its discretion in refusing to follow the probation officer's recommendation that appellant be committed to the CYA.

At the outset, we point out that the probation department's recommendation of commitment to CYA was only for "diagnosis and recommendation pursuant to section 1731.6 of the Welfare and Institutions Code." The probation officer reported that the "most appropriate disposition" was "unclear." She was giving "serious consideration . . . to a recommendation

for state prison as a final sentence" because of the "seriousness of the crimes" appellant committed, yet she was concerned that defendant had a "negligible prior arrest history and appears to be suffering from some emotional problems of an undetermined degree of severity."

In light of her uncertainty, the probation officer recommended that appellant be evaluated by the CYA pursuant to Welfare and Institutions Code section 1731.6. Such an evaluation, she noted, "should assist the probation officer in determining if defendant, who is 19 years old, should be committed to state prison or if he is acceptable to the Youth Authority and can be better handled by that agency."

Welfare and Institutions Code section 1731.6 in pertinent part provides: "(a) In any county in which there is in effect a contract made pursuant to Section 1752.1, if a court has determined that a person comes within the provisions of Section 1731.5 and concludes that a proper disposition of the case requires such observation and diagnosis as can be made at a diagnostic and treatment center of the Youth Authority, the court *may* continue the hearing and order that such person be placed temporarily in such a center for a period not to exceed 90 days, with the further provision in such order that the Director of the Youth Authority report to the court its diagnosis and recommendations concerning the person within the 90-day period." (Italics added.)

Appellant does not actually argue the propriety of the trial court's refusal to order that he be temporarily placed in CYA for observation and diagnosis, but urges instead that the trial court erred in sentencing him to state prison instead of committing him to the CYA. We, therefore, restrict our discussion to the question actually presented.

Welfare and Institutions Code section 1731.5, subdivision (a) provides: "(a) After certification to the Governor as provided in this article a court may commit to the authority any person convicted of a public offense who comes within paragraphs (1), (2), and (3), or paragraphs (1), (2), and (4), below.

"(1) Is found to be less than 21 years of age at the time of apprehension.

"(2) Is not convicted of first-degree murder, committed when such person was 18 years of age or older, or sentenced to death, imprisonment for life, imprisonment for 90 days or less, or the payment of a fine, or after having been directed to pay a fine, defaults in the payment thereof, and is subject to imprisonment for more than 90 days under the judgment.

"(3) Is not granted probation.

"(4) Was granted probation and probation is revoked and terminated."

In this case, had appellant been properly convicted he would have been eligible for commitment to the CYA in that he came within paragraphs (1), (2) and (3) of subdivision (a) of Welfare and Institutions Code section 1731.5.

Under that section, "certification to the Youth Authority by the trial judge is discretionary rather than mandatory. [Citation.] On appeal, the trial court's decision will not be disturbed in the absence of an abuse of discretion. [Citations.] The standard for exercise of that discretion is the offender's suitability for the rehabilitative program of the Youth Authority; the social interests usually involved in fixing sentence would also play a part. [Citation.]" (*People* v. *Martin* (1980) 108 Cal.App.3d 1014, 1020-1021 [167 Cal.Rptr. 33].)

Appellant contends that the trial court abused its discretion in sentencing appellant to state prison because "it completely ignored the issue of appellant's suitability for the rehabilitative program of the Youth Authority."

■ While it is clear from the record on appeal that the trial court found that appellant was not suitable for commitment to the CYA, the reason he stated for so finding is faulty. The trial court stated that the CYA has "turned down all kinds of people that were more appropriate than this one, right, left, and center, and they're still doing it." It further stated, "The probation department has many times made the same precise recommendation on people who I thought the Youth Authority should accept. They do not accept them. We're just looking at reality."

Welfare and Institutions Code section 1731.5, subdivision (b) provides: "(b) The Youth Authority shall accept a person committed to it pursuant to this article if it believes that the person can be materially benefited by its reformatory and educational discipline, and if it has adequate facilities to provide such care."

Rather than determining whether appellant was suitable for and could benefit from the rehabilitative programs at the CYA, the trial court speculated that it would not accept him. In so doing, the court attempted to speculate whether the CYA would accept appellant under Welfare and Institutions Code section 1731.5, subdivision (b). This amounted to an abuse of discretion. Should appellant be convicted at a new trial, the trial court

shall independently determine whether appellant is suitable for CYA commitment.

During the probation and sentence hearing the trial court stated:

"I don't consider it to be a proper disposition of this case either, the Youth Authority. I'll make no bones about it. This was a jury trial. The jury returned a verdict of manslaughter. In my opinion, the jury should have returned a verdict of murder. Now, it was obviously their prerogative as the tryer [*sic*] of fact, but in determining the facts with his mind, I can also consider the circumstances of the offense, This was murder.

"You did an admirable job, Mr. Pransky [*appellant's trial counsel*], because you got twelve people to come back with a manslaughter. Perhaps that's the only way they could come back with a verdict at all. Perhaps that's the reason for it. But in considering the appropriate penalty, I don't have to defer absolutely what I have heard, all the facts upon which the verdict was predicated. If this is indeed a manslaughter, it's absolutely the most aggravated manslaughter I've ever perceived."

While the severity of the crime is a sentencing concern which has independent importance in arriving at the ultimate disposition, the trial judge's personal belief that appellant should have been convicted of murder instead of voluntary manslaughter shall play no part in the process.

### III

Lastly, appellant contends that the trial court committed reversible error in failing to state its reasons for sentencing appellant to state prison for the high term prescribed by law for the crime of voluntary manslaughter. (See Pen. Code, § 193, subd. (a).)

For the guidance of the trial court on any retrial, we note that should appellant again be sentenced to state prison for his crimes and should the upper term prescribed for the crime of voluntary manslaughter be imposed, the trial court is required under Penal Code section 1170, subdivision (c)[2] to state its reasons for so doing.

---

[2]Penal Code section 1170, subdivision (c), in pertinent part, provides: "(c) The court *shall* state the reasons for its sentence choice on the record at the time of sentencing." (Italics added.)

The judgment is reversed.

Woods, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied January 3, 1984, and respondent's petition for a hearing by the Supreme Court was denied February 16, 1984.