**Albert D'AURIZIO, Plaintiff,**

v.

**BOROUGH OF PALISADES PARK, et al., Defendants.**

**Civ. A. No. 93–4417 (NHP).**

United States District Court, D. New Jersey.

Sept. 29, 1995.

Michael S. Kimm, Hackensack, NJ.

Frederic Paul Gallin, Methfessel and Werbel, Rahway, NJ.

### OPINION

HEDGES, United States Magistrate Judge.

### INTRODUCTION

Albert D'Aurizio, the plaintiff in this civil rights action, seeks to compel a nonparty

witness, Susan Spohn, to answer certain deposition questions intended to secure evidence of how she voted in a school board election and in several general elections. The issue was brought to my attention during a conference. I directed the parties to submit letter briefs. I heard oral argument on September 26, 1995.[1]

### DISCUSSION

Plaintiff describes the "background" for his application as follows:

> This is an action for political termination of plaintiff, a school custodian, whom defendants characterize, in effect, as the 'lowest man on the totem pole.' The primary claims arise under §§ 1983, 1985 and 1986 of the Civil Rights Act, for conspiracy and attendant acts. Plaintiff alleges (and has developed overwhelming proof in discovery) that he was punished by the Palisades Park Republican leaders because he ran (unsuccessfully) as an independent candidate for the borough council in November 1991. Various named and unnamed co-conspirators participated in the actions which led to plaintiff's elimination due to pretextual 'budgetary constraints.'

Although, as plaintiff acknowledges, his "primary claims" arise under the Civil Rights Act, he has asserted State law claims.

■ Any analysis of privilege must begin with Rule 501 of the Federal Rules of Evidence:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness * * * shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege

---

1. By letter dated July 19, 1995, I invited the Civil Rights Division of the United States Department of Justice to appear in a *amicus* capacity. The Division declined to do so.

of a witness * * * shall be determined in accordance with State law.

"Under this rule, in federal question cases the federal common law of privileges applies." *Wm. T. Thompson Co. v. General Nutrition Corp.,* 671 F.2d 100, 103 (3d Cir. 1982). Resolving a question of first impression in the Third Circuit, *Wm. T. Thompson Co.* held that, "when there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule." 671 F.2d at 104. However, this holding does not "preclude resort to state law analogies for the development of a federal common law of privileges in instances where the federal rule is unsettled." 671 F.2d at 104. Accordingly, in the civil action before me, which includes both federal and State law claims, I must consider plaintiff's application under the federal common law of privileges.

In *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), the Supreme Court modified the common law privilege for adverse spousal testimony "so that the witness-spouse alone has a privilege to refuse to testify adversely * * *." 445 U.S. at 53, 100 S.Ct. at 914. In so doing, the Supreme Court discussed the intent of Rule 501:

> The general mandate of Rule 501 was substituted by the Congress for a set of privilege rules drafted by the Judicial Conference Advisory Committee on Rules of Evidence and approved by the Judicial Conference of the United States and by this Court. That proposal defined nine specific privileges * * *. In rejecting the proposed Rules and enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to 'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis,' 120 Cong. Rec. 40891 (1974) (statement of Rep. Hungate), and to leave the door open to change. [445 U.S. at 47, 100 S.Ct. at 910–11].

Among other things, the Supreme Court observed that modification of the privilege would be consistent with the trend in state law and scholarly criticism and that the "ancient foundations" for the sweeping common law privilege had disappeared. 445 U.S. at 48–50, 52, 100 S.Ct. at 911–12, 913.

In *University of Pennsylvania v. Equal Employment Opportunity Commission,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), the Supreme Court refused to recognize a common law privilege "against the disclosure of peer review materials" in a Title VII action. 493 U.S. at 189, 110 S.Ct. at 582. The Supreme Court addressed the creation of evidentiary privileges as follows:

> We do not create and apply an evidentiary privilege unless it 'promotes sufficiently important interests to outweigh the need for probative evidence....' *Trammel v. United States,* 445 U.S. 40, 51 [100 S.Ct. 906, 912, 63 L.Ed.2d 186] (1980). Inasmuch as '[t]estimonial exclusionary rules and privileges contravene the fundamental principle that "public ... has a right to every man's evidence," ' *id.* at 50 [100 S.Ct., at 912], quoting *United States v. Bryan,* 339 U.S. 323, 331 [70 S.Ct. 724, 730, 94 L.Ed. 884] (1950), any such privilege must 'be strictly construed.' 445 U.S., at 50 [100 S.Ct., at 912].
>
> Moreover, although Rule 501 manifests a congressional desire 'not to freeze the law of privilege' but rather to provide the courts with flexibility to develop rules of privilege on a case-by-case basis, *id.,* at 47 [100 S.Ct., at 910–11], we are disinclined to exercise this authority expansively. [493 U.S. at 189, 110 S.Ct. at 582].

In rejecting the privilege claim, the Supreme Court noted that Congress had been aware of the potential burden of disclosure of peer review materials when it enacted Title VII, that recognition of the privilege would likely lead to similar privilege claims and that the privilege had no historical or statutory basis. 493 U.S. at 191, 194–95, 110 S.Ct. at 583, 584–85.

*Trammel* and *University of Pennsylvania* caution a federal court to tread warily in recognizing a privilege. Nevertheless, Rule 501 "provide[s] the courts with greater flexibility in developing rules of privilege on a case-by-case basis." *United States v. Gillock,* 445 U.S. 360, 367, 100 S.Ct. 1185, 1190,

63 L.Ed.2d 454 (1980); *see In Re Grand Jury Investigation (Appeal of United States)*, 918 F.2d 374, 378–79 (3d Cir.1990).[2]

What test governs recognition of a privilege? In *In Re Grand Jury Investigation (Appeal of United States), supra*, the Third Circuit Court of Appeals "weigh[ed] Dean Wigmore's four fundamental prerequisites for a privilege against the disclosure of communications" in recognizing the common law clergy-communicant privilege. 918 F.2d at 383–84. These are:

> (1) The communications must originate in a *confidence* that they will not be disclosed.

> (2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

> (3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*

> (4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation. [8 Wigmore, *Evidence* § 2285 at p. 527 (McNaughton rev. ed. 1961) (footnote omitted) (emphasis in original) ].

The court also "considered the balancing process described by Judge Weinstein" in *United States v. King*, 73 F.R.D. 103 (E.D.N.Y. 1976):

> [T]he justifiable 'principles of the common law' as they relate to matters of developing new privileges—those not firmly embedded in federal law—require the balancing of four factors: first, the federal government's need for the information being sought in enforcing its substantive and procedural policies; second, the importance of the relationship or policy sought

to be furthered by the state rule of privilege and the probability that the privilege will advance that relationship or policy; third, in the particular case, the special need for the information sought to be protected; and fourth, in the particular case, the adverse impact on the local policy that would result from non-recognition of the privilege. [918 F.2d at 384 n. 12 (*quoting United States v. King, supra,* 73 F.R.D. at 105) ].

The *Wigmore* and *King* factors are reflected in a "somewhat broader and more refined list of criteria" proposed by Professors Mueller and Kirkpatrick:

> (1) the importance to the community of the relationship sought to be protected; (2) whether community values would be offended by governmental intrusion into the privacy of the relationship; (3) the extent to which societal traditions and professional standards create a reasonable expectation of confidentiality in such a relationship; (4) whether the purpose of the relationship depends upon full and open communication; (5) the extent to which such communication would be impeded by non-recognition of a privilege; and (6) the direct and indirect benefits to the public from encouraging the communication and protecting the privacy of the relationship in comparison to the cost to the litigation process resulting from the loss of evidence. [2 C. Mueller & L. Kirkpatrick, *Federal Evidence* § 172 at p. 232 (2d ed. 1994) (footnote omitted) ].

I adopt these latter criteria, addressed to the tenor of a vote rather than a communication *per se,* here.[3]

"[A] party who asserts a privilege has the burden of proving its existence and applicability." *In Re Grand Jury Investiga-*

**2.** "An important question is whether Rule 501 permits the Federal Courts to promulgate and develop privileges that did not exist at common law." 2 S. Saltzburg, M. Martin & D. Capra, *Federal Rules of Evidence Manual* p. 589 (6th ed. 1994). This question has been answered in the affirmative by *Trammel* and *University of Pennsylvania. Id.; In Re Doe*, 964 F.2d 1325, 1328 (2d Cir.1992). Rule 501 endorses "a continuation of the evolution of a federal common law of privileges which began long before the Rules of

Evidence were enacted." 2 C. Mueller & L. Kirkpatrick, *Federal Evidence* § 172 at p. 226 (2d ed. 1994). Rule 501 provides a "mandate to develop evidentiary privileges in accordance with common law principles." *In Re Grand Jury Investigation (Appeal of United States), supra,* 918 F.2d at 379.

**3.** Although I choose to follow the Mueller and Kirkpatrick criteria, my analysis is consistent with both Wigmore and *King.*

*tion (Appeal of United States), supra,* 918 F.2d at 385 n. 15. The decision to recognize a privilege is a two-step process. First, a court must decide whether a privilege exists or should exist. That decision must "follow from a more broad-based view of how the privilege will work in general." Second, the court must decide how to apply the privilege to a particular case. *In Re Grand Jury (Granite Purchases),* 821 F.2d 946, 955 (3d Cir.1987), *cert. denied Colafella v. United States,* 484 U.S. 1025, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

I deem it appropriate to begin my analysis with proposed Rule 507 of the Federal Rules of Evidence. The Supreme Court sent nine specific privilege rules to Congress. *Trammel v. United States, supra,* 445 U.S. at 47, 100 S.Ct. at 910–11; *United States v. Gillock, supra,* 445 U.S. at 367, 100 S.Ct. at 1190. One of these, proposed Rule 507, would have specifically recognized a political vote privilege:

> Every person has a privilege to refuse to disclose the tenor of his vote at a political election conducted by secret ballot unless the vote was cast illegally. [56 F.R.D. 249].

Congress did not adopt the proposed privilege rules transmitted to it by the Supreme Court. "Aside from the Lawyer–Client privilege (proposed Rule 503), the Communications to Clergy privilege (proposed Rule 506), *and the Political Vote privilege* (proposed Rule 507), each of the nine privilege Rules was vigorously attacked * * *." 2 S. Saltzburg, M. Martin, & D. Capra, *Federal Rules of Evidence Manual* p. 587 (6th ed. 1994) (emphasis added); *see In Re Grand Jury Investigation (Appeal of United States), supra,* 918 F.2d at 381 n. 9. However, Congress did not disapprove the proposed rules. "[T]he proposed rules provide a useful reference point and offer guidance in defining the existence and scope of evidentiary privileges in the federal courts." *In Re Grand Jury Investigation (Appeal of United States), supra,* 918 F.2d at 380. Indeed, in *United States v. Gillock, supra,* the Supreme Court stated that, since "[n]either the Advisory Committee, the Judicial Conference, nor this Court saw fit * * * to provide the privilege

sought * * * [by the respondent] that fact * * * does suggest that the claimed privilege was not thought to be either indelibly ensconced in our common law or an imperative of federalism." 445 U.S. at 367–68, 100 S.Ct. at 1190–91 (footnote omitted). Thus, inclusion of the proposed political vote privilege and its noncontroversial nature "strongly suggests that the privilege is, in the words of the Supreme Court 'indelibly esconsed' in the American common law." *In Re Grand Jury Investigation (Appeal of United States), supra,* 918 F.2d at 381.

Did the political vote privilege exist at American common law? The earliest reported decision which recognized the privilege (and which was relied on in the Advisory Committee Note to proposed Rule 507) is *Johnston v. Charleston,* 1 S.C.L. (1 Bay) 441 (1795). Wigmore also recognized the privilege at common law. 8 Wigmore, *Evidence* § 2214(b) at pp. 162–63 (McNaughton rev. ed. 1961); *see* 2 Mueller & Kirkpatrick, *supra,* § 217 at p. 493 ("No doubt a privilege closely approximating the one described in proposed FRE 507 exists at common law"); Nutting, "Freedom of Silence: Constitutional Protection Against Governmental Intrusions in Political Affairs," 47 *Mich.L.Rev.* 181, 191 (1948) (discussing early decisions). Courts of appeals have referred to the privilege, albeit in contexts other that the one *sub judice. In Re Dinnan,* 661 F.2d 426, 431–32 (5th Cir. 1981), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982) (declining to extend "common law privilege designed to protect the secret ballot" to professor's vote on promotion application); *National Federation of Ry. Workers v. National Mediation Bd.,* 110 F.2d 529, 536–37 (D.C.Cir.), *cert. denied,* 310 U.S. 628, 60 S.Ct. 975, 84 L.Ed. 1399 (1940) (statement of voter incompetent to impeach ballots for labor election; to allow same would lead to "loss of the freedom of choice associated with the secret ballot").

Not only did the privilege exist at common law, but it is recognized today by the states within the Third Circuit. N.J.S.A. 19:15–26 provides for a secret ballot and for punishment of those who violate voter secrecy:

> Every voter to whom a ballot is given shall thereupon retire into the polling

booth. Not more than one voter, except as hereinafter provided, shall be permitted to enter or be in the same booth, at one time. The voter shall prepare his ballot in the booth secretly and screened from the observation of others.

Any person or voter who shall violate the provisions of this section shall be deemed guilty of a misdemeanor * * *.

Rule 513 of the New Jersey Rules of Evidence (N.J.S.A. 2A:84A–25) specifically recognizes the privilege: "Every person has a privilege to refuse to disclose the tenor of his vote at a political election unless the judge finds that the vote was cast illegally."

Article 7, § 4 of the Pennsylvania Constitution provides: "All elections by the citizens shall be by ballot or by such other method as may be prescribed by law: Provided, That secrecy in voting be preserved." "This provision has been interpreted to mean that a voter may not be compelled to reveal how he voted in an election * * * [unless] it can be proven that the voter voted unlawfully * * *." 1 L. Packel & A. Poulin, *Pennsylvania Evidence* § 512 at p. 340 (1987) (footnotes omitted); *see In Re Appeal of Orsatti,* 143 Pa.Cmwlth.Ct. 12, 598 A.2d 1341, 1343–44, *appeal dismissed,* 529 Pa. 637, 600 A.2d 956 (1991).

Delaware also recognizes the political vote privilege. Rule 506 of the Delaware Uniform Rules of Evidence provides:

(a) *General Rule of Privilege.* Every person has a privilege to refuse to disclose the tenor of his vote at a political election conducted by secret ballot.

(b) *Exceptions.* This privilege does not apply if the court finds that the vote was cast illegally or determines that the disclosure should be compelled pursuant to the election laws of this State.

The Delaware rule is based on Rule 506 of the Uniform Rules of Evidence, which is in turn based on proposed Federal Rule 507. Comment, Delaware Uniform Rule of Evidence 506.

The Uniform Rules of Evidence were based in part on the proposed federal privilege rules:

The failure of Congress to enact specific rules of privilege left the Federal Rules of Evidence with a large gap when viewed as a potential model code for possible adoption by the states. Therefore, in promulgating the Revised Uniform Rules of Evidence (1974), based almost entirely on the Federal Rules, the National Conference of Commissioners on Uniform State Laws included specific rules of privilege. These are substantially the version of the Federal Rules submitted to Congress, but contain some notable changes. Some states adopting rules or codes based upon the Federal Rules have adopted the proposed Federal Rules concerning privilege, others have adopted the Uniform Rules on this subject, and some have retained their antecedent rules of privilege. [1 J. Strong, *McCormick on Evidence* § 75 at p. 283 (4th ed. 1992) (footnotes omitted)].

Rule 506 of the Uniform Rules of Evidence provides:

(a) **General rule of privilege.** Every person has a privilege to refuse to disclose the tenor of his vote at a political election conducted by secret ballot.

(b) **Exceptions.** This privilege does not apply if the court finds that the vote was cast illegally or determines that the disclosure should be compelled pursuant to the [election laws of the state].

Four states (including Delaware) adopted this rule verbatim. Eleven states (including New Jersey) and Puerto Rico adopted the rule with some variation. 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 507[05] (1980 & Supp.1995).

Fifteen states have adopted the uniform rule in one form or another. Moreover, the privilege is widely recognized throughout the United States, deriving from state constitutions, state laws and/or the common law. *E.g., People v. Wells,* 149 Cal.App.3d 721, 197 Cal.Rptr. 163, 167 (1983); *Taylor v. Pile,* 154 Colo. 516, 391 P.2d 670, 673 (1964) (*en banc*); *Mansfield v. Scully,* 129 Conn. 494, 29 A.2d 444, 449 (1942); *Lambeth v. Levens,* 237 Kan. 614, 702 P.2d 320, 325 (1985); *Wood v. Kirby,* 566 S.W.2d 751, 753 (Ky.Sup.Ct.1978); *McRobbie v. Registrars of Voters,* 322 Mass. 530, 78 N.E.2d 498, 500 (1948); *Belcher v.*

*Mayor,* 402 Mich. 132, 262 N.W.2d 1, 2 (1978) (*per curiam* ); *Hubbard v. McKey,* 193 So.2d 129, 132 (Miss.Sup.Ct.1966); *Mullen v. Heffernan,* 193 Misc. 334, 84 N.Y.S.2d 571, 575 (Sup.Ct.), *aff'd mem.,* 274 A.D. 972, 85 N.Y.S.2d 301, *aff'd mem.,* 298 N.Y. 785, 83 N.E.2d 473 (1948); Annot., "Privilege or Exemption of Voter Against Testifying as to Candidate for Whom He Cast His Vote, Or as to His Vote on Submitted Questions," 90 *A.L.R.* 1362 (1934); 26 *Am.Jur.2d,* Elections § 347 at p. 166 (1966); 29 *C.J.S.,* Elections § 281 at pp. 749–51 (1965); Nutting, *supra,* 47 *Mich.L.Rev.* at 195.

The political vote privilege has been recognized by the Supreme Court in proposed Rule 507. The privilege exists at common law and is well-recognized among the states. However, "[t]he justification for a privilege must be specific, for courts should apply privileges 'only to the extent necessary to achieve their purpose.' " *In Re Grand Jury (Granite Purchases), supra,* 821 F.2d at 955 (*quoting In Re Grand Jury (Freedman & Cortese),* 541 F.2d 373, 382 (3d Cir.1976)). What interests do the political vote privilege serve today?

The Advisory Committee note to proposed Rule 507 described the purpose of the privilege as follows:

Secrecy in voting is an essential aspect of effective democratic government, insuring free exercise of the franchise and fairness in elections. Secrecy after the ballot has been cast is as essential as secrecy in the act of voting. Nutting, Freedom of Silence: Constitutional Protection Against Governmental Intrusion in Political Affairs, 47 Mich.L.Rev. 181, 191 (1948). Consequently a privilege has long been recognized on the part of a voter to decline to disclose how he voted. Required disclosure would be the exercise of 'a kind of inquisitorial power unknown to the principles of our government and constitution, and might be highly injurious to the suffrages of a free people, as well as tending to create cabals and disturbances between contending parties in popular elections.' *Johnston v. Charleston,* 1 Bay 441, 442 (S.C.1795). [56 F.R.D. 249].

Weinstein and Berger gave this rationale for proposed Rule 507:

The political vote privilege is a logical corollary of the secret ballot. Secrecy in voting is essential to the democratic process in obtaining the free exercise of the franchise and accurate voter opinion. This secrecy could be nullified if the privilege of a voter to remain silent after he had voted were not also guaranteed. Although the voter alone can invoke the privilege or waive the privilege * * *, the interest protected is not solely that of the voter himself. The interest of society as a whole predominates. As one commentator explained:

'Obviously, then, the social interest in honest elections is of the greatest importance. One of the means by which that interest can be protected is through the secrecy of the ballot which, in turn, is accomplished by requiring secrecy from the individual voter at the time the ballot is cast and by according him the privilege of secrecy thereafter. But the extent of the privilege depends primarily on considerations of social utility rather than on the convenience of the individual. In a sense, protection is always granted to individual interests for social reasons, but here it would seem that, unlike, for example, situations involving the privilege against self-incrimination or the right of free speech, the social interest is relatively more immediate and direct than is that of the individual.' [Weinstein & Berger, *supra,* ¶ 507[02] at p. 507–3 (*quoting* Nutting, *supra,* 47 *Mich.L.Rev.* at 195 (footnotes omitted) ].

Wigmore gave a similar explanation for the common law political vote privilege:

The community's interest is that the citizen's vote, the culminating act by which his opinion is made most effective, should be absolutely sincere—i.e., should represent accurately his opinion upon the persons or the propositions presented for choice. At the time of voting, especial danger exists that influences of oppression will prevail to coerce the elector into an insincere vote. This danger affects the welfare of the state itself, as dependent upon freedom of politi-

cal action. Therefore there is a need for securing secrecy of voting in order that the vote may correctly represent the voter's opinion.

The main expedient for this purpose is to provide such apparatus at the polls as secures permissive and, under modern systems, compulsory secrecy. But this expedient would be deficient if also the privilege were not conceded of being silent ever afterwards as to the tenor of the vote. Thus it is that the privilege of not disclosing, in a court of justice, a formal act of expression of the witness' political opinion done at a prior time comes to be recognized as a corollary of the secrecy of the ballot.

That a privilege exists not to disclose by the witness' own testimony the *tenor of his vote* has not been doubted * * *. [8 Wigmore, *supra,* § 2214(b) at pp. 162–63 (footnote omitted) (emphasis in original)].

The secret ballot is central to our concepts of democracy and ordered liberty.[4] "The Constitution does not by its very terms guarantee the right to vote in public elections by secret ballot, but the custom is observed uniformly throughout the country and has been recognized as a fundamental right of constitutional overtones." 2 Mueller & Kirkpatrick, *supra,* § 217 at p. 494 (footnote omitted). "In this country a person's right to vote secretly is inviolate." *Buckley v. Valeo,* 519 F.2d 821, 867 n. 117 (D.C.Cir.), *aff'd in part and rev'd in part on other gds.,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1975).

The political vote privilege is a necessary corollary to the secret ballot. "If an individual's ballot was not privileged, the policy of the secret ballot could be frustrated easily." *In Re Dinnan, supra,* 661 F.2d at 432 (footnote omitted). "The secrecy of the ballot is one of the fundamental civil liberties upon which a democracy must rely most heavily in

order for it to survive." *United States v. Executive Committee of Democratic Party,* 254 F.Supp. 543, 546 (N.D. & S.D.Ala.1966).

Plaintiff argues against the recognition of the privilege under Rule 501:

The Senate Report specifically states that the concept of 'political vote privilege' is a *non-constitutional* concept, *see* Senate Rep., thus indicating the lawfulness of a compelled disclosure in appropriate circumstances. (In other words, the issues should be resolved by traditional evidentiary principles of relevancy versus prejudice under F.R.E. 401, 402, and 403) in light of reason and experience, F.R.E. 501.

Under F.R.E. 501, as applied since adoption, new judge-made privileges, such as 'political vote privilege' have been universally disfavored by courts and commentators alike. *See e.g.,* C. McCormick, *Law of Evidence,* § 75 (4t ed. 1992). In a highly 'political' case, the Supreme Court reasoned that 'exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.' *United States v. Nixon,* 418 U.S. 683, 710 [94 S.Ct. 3090, 3108–09, 41 L.Ed.2d 1039] (1974).

According to plaintiff's comprehensive research, neither the Third Circuit not any of the within districts have ever recognized a 'political vote privilege.' It would be highly inappropriate to recognize it where, as here; political reprisal is *the* central issue.

■ Rule 501 contemplates that privileges may derive from the Constitution, Act of Congress, Supreme Court rule, or "the principles of the common law." To argue against a privilege because it is "nonconstitutional" is contrary to Rule 501.[5]

---

4. "[T]he tradition of secrecy through the use of the ballot has the sanction of antiquity in this country although it did not come by way of England." Nutting, *supra,* 47 *Mich.L.Rev.* at 182. English practice before the American Revolution was to "make evident the choice of each individual voter," which practice was imported into colonial America. The secret ballot was apparently imported from Holland by Puritans and others who had observed it there. The se-

cret ballot eventually came to be "quite generally required" by early state constitutions. 47 *Mich. L.Rev.* at 181–86.

5. Whether voter secrecy is "nonconstitutional" raises a serious question. "At the core of first amendment values is the right to espouse political views and associate for political purposes. * * * Inherent in this guarantee is the sanctity of the ballot." *Kirksey v. City of Jackson,* 663 F.2d

Common law privileges exist to foster underlying societal values. For example,

[t]he privileges between priest and penitent, attorney and client, and physician and patient limit protection to private communications. These privileges are rooted in the imperative need for confidence and trust. The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return. The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out. Similarly, the physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment. [*Trammel v. United States, supra*, 445 U.S. at 51, 100 S.Ct. at 913].

That a privilege may be nonconstitutional does not vitiate the need for it or make it conditional.

Plaintiff also argues against recognition of the privilege because of the "political" nature of this civil action. I assume the argument to be that the privilege should not be recognized whenever it is alleged that a local governing body acted in such a way as to harm a plaintiff in response to the plaintiff's political activities.

I must first decide whether a privilege exists or should exist. In making that decision, I must consider how the privilege will work in general. *In Re Grand Jury (Granite Purchases), supra*, 821 F.2d at 955. Plaintiff's argument, if accepted, would lead to a privilege of uncertain dimension and which would be subject to manipulation by a litigant through the framing of pleadings. This would preclude reliance on the existence of the privilege and discourage conduct which the privilege was intended to encourage. *See* 821 F.2d at 955.

In any event, the political vote privilege already extends to "political" matters. Proposed Rule 507 of the Federal Rules of Evidence provided for an exception to the privilege when a vote was "cast illegally." Rule 506(b) of the Uniform Rules of Evidence has a similar exception. This exception, which also existed at common law, represents a balancing between competing interests:

A number of states have recognized the privilege by implication through provisions that, if it is determined that a person has voted *illegally*, he may be questioned as to the candidate for whom his ballot was cast.

The last sentence indicates that legislation on the subject has confined the privilege to the legal voter. In this respect, the statutes follow the case law which, even in the absence of legislation, has developed the rule that only legal voters are protected, subject, of course, to the privilege against self-incrimination. Such a qualification of the privilege seems clearly justified. Protection of the legal voter is necessary in order to insure honest elections, free from intimidation, bribery and other forms of corrupt influence. However, if a person not qualified to vote has succeeded in doing so, an inquiry into his action is necessary if dishonesty at the polls is to be discovered and punished. * * *. [Nutting, *supra*, 47 *Mich.L.Rev.* at 192].

*See, e.g., Wigmore, supra*, § 2214(b) at p. 163.

Plaintiff's argument ignores the purpose of the political vote privilege, which is to ensure voter secrecy. It would make voter secrecy dependent on an individual voter's future "good" behavior and would abrogate the privilege for future conduct alleged to be wrongful and unrelated to the act of voting. Plaintiff's argument also ignores the balance already struck between competing interests. Plaintiff's argument must be rejected.

■ Should the political vote privilege be recognized under Rule 501? The privilege exists at common law. It is recognized among the states and in scholarly criticism. "[T]here appears little doubt that, if the issue

659, 662 (5th Cir.1981). If the Constitution guarantees a secret ballot the political vote privilege may likewise be guaranteed. Such an argument was advanced over forty years ago. Nutting, *supra*, 47 *Mich.L.Rev.* at 195–200. I need not, however, resolve this question.

were presented in a proper case, such a privilege would be held to exist under federal law." M. Larkin, *Federal Testimonial Privileges* § 10.03[1] at p. 10–16 (1995).[6]

The political vote privilege is a necessary corollary to secrecy in voting, which is an "essential aspect of democratic government." Advisory Committee Note to Proposed Rule 507, 56 F.R.D. 249. Any intrusion on so central an aspect of democracy would obviously offend community values. Voter secrecy—both when a vote is cast and after—is protected throughout the United States. Voter secrecy ensures both free and fair elections. Nonrecognition of the political vote privilege would put at risk an essential aspect of American democracy. Although the privilege is contrary to the fundamental principle that "the public has a right to every man's evidence," the need to protect voter secrecy is sufficiently—and overwhelmingly—important to outweigh that principle.[7]

I am satisfied that "the principles of the common law" interpreted "in the light of reason and experience" as well as the factors set forth by Wigmore, Judge Weinstein and Professors Mueller and Kirkpatrick, compel recognition of the privilege. The political vote privilege should apply to protect (1) from compulsory disclosure (2) the tenor of a person's vote (3) at a political election (4) conducted by secret ballot (5) unless the vote was cast illegally.[8]

█ The application of the privilege to the case before me is straightforward. Ms. Spohn served as a member of the Palisades Park Borough Council during the relevant time period. She was deposed by plaintiff on June 2, 1995. At the deposition, she was asked:

Q. Do you remember voting in the April '92 School Board elections?

A. I'm sure I voted.

Q. Did you vote for the three people I just mentioned?

    \*     \*     \*     \*     \*     \*

A. I won't answer the question.

    \*     \*     \*     \*     \*     \*

Q. Have you ever voted anything other than Republican in the last five years?

    \*     \*     \*     \*     \*     \*

A. I would rather not answer that.

[Transcript at p. 131, 1.12 to p. 132, 1.9].

Plaintiff's intent is to present Ms. Spohn's answers to the jury and have the jury infer that she acted as a council member consistent with the tenor of her votes at these elections.

Ms. Spohn voted in a school board election and in general elections. Under New Jersey law her ballot was secret. Ms. Spohn refused to voluntarily disclose the tenor of her vote. The political vote privilege as I have defined it is applicable.

### CONCLUSION

For the reasons set forth above, I am satisfied that a political vote privilege exists at federal common law and that the applica-

---

6. The privilege has also been recognized by Congress. 18 U.S.C. § 596 makes it illegal to poll any member of the Armed Forces "with reference to his choice of or his vote for any candidate" or to release "any result of any purported poll."

7. For example, assume that the witness here voted for opposition party candidates regularly. If plaintiff's theory of the case is correct, the witness risks being retaliated against for "disloyalty." This alone demonstrates the need for the political vote privilege.

8. The privilege should be absolute rather than qualified. Professors Saltzburg, Martin and Capra, in their *Federal Rules of Evidence Manual*, argue that "the radical step of imposing a new privilege should be tempered by a holding that any such privilege is qualified \* \* \*." 2 Saltzburg, Martin & Capra, *supra*, at 592. The "new" privilege they refer to, one that did not exist at common law. The political vote privilege is not "new." It existed at common law and should be treated as being absolute, as are the common law lawyer-client and clergy-communicant privileges. To do otherwise would frustrate—and make conditional on the merits of a particular case—voter secrecy.

This interpretation is consistent with the expansion of the political vote privilege into the area of political opinion and association, an expansion which may be "new" (*i.e.*, unknown at common law) and is of "uncertain dimension." Qualified privileges have been recognized in this area. 2 Weinstein & Berger, *supra*, ¶ 507[03] at p. 507–5; 2 Mueller & Kirkpatrick, *supra*, § 217 at pp. 495–96.

tion of plaintiff to compel the disclosure of the tenor of Susan Spohn's vote should be denied. An Order accompanies this Opinion.